No. 24-12243

----------------------------------------------------------------------------------------

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

DR. DARE ADEWUMI,

Plaintiff-Appellant,

v.

WELLSTAR MEDICAL GROUP and WELLSTAR HEALTH
SYSTEMS, INC.

Defendant-Appellee,

NORTHSIDE HOSPITAL, INC.

Defendant.

Appeal from the United States District Court for the Northern District of
Georgia
No. 21 cv 04048

**APPELLANT'S OPENING BRIEF**

Michael H. Sussman, Esq.
1 Railroad Avenue
Goshen, New York
(845)-294-3991
Attorney for Dr. Dare Adewumi

**U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT (CIP)**

_DR. DALE ADELMAN_ vs. _WELLSTAR MEDICAL GROUP, LLC, et al._ Appeal No. _24-12243_

11th Cir. R. 26.1-1(a) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed. Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. **You may use this form to fulfill these requirements.** In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party. _**(Please type or print legibly)**_:

Adelman, Dale,    Plaintiff/Appellant

Fuller, J. Clay,    Magistrate Judge

Hart, Daniel P.,    Counsel for Appellee

Hill, Jr., William B.,    Counsel for Appellee

Hoffler, Tricia P.,    Counsel for Appellant

Pannell, Charles A.,    District Court Judge

Sussman, Michael H.,    Counsel for Appellant

Wellstar Health Care Systems, Inc.,    Appellee

Wellstar Medical Group,    Appellee

Submitted by:
Signature: _Michael H. Sussman_
Name: _Michael H. Sussman_                Prisoner # (if applicable): _____
Address: _1 Railroad Avenue, Goshen, NY 10924_
Telephone #: _845-294-3991_

Rev.: 2/23

C-1

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument because of the importance of the issues to the parties, their factual complexity the numerosity and significance of the errors made below and the unsettled nature of the controlling law relating both to the elements of a prima facie case and the permissible means of establishing pretext.

## TABLE OF CONTENTS

**CERTIFICATEOF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**     C-1

**STATEMENT REGARDING ORAL ARGUMENT**     i

**TABLE OF CONTENTS**     ii-iii

**JURISDICTIONAL STATEMENT**     1

**STATEMENT OF THE ISSUES**     1

**STATEMENT OF THE CASE**     1-2

**STATEMENT OF FACTS**     2-16

**SUMMARY OF THE ARGUMENT**     16

**ARGUMENT**     16-44

**I. STANDARD OF REVIEW**     16-17

**II. SUBSTANTIVE STANDARDS**     17-21

**III. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT**     21-45

**A. APPELLANT ESTABLISHED A PRIMA FACIE CASE**     21-24

**B. APPELLANT ESTABLISHED PRETEXT**     24-29

**C. SPECIFIC ERRORS BY DISTRICT COURT**     29-45

**CONCLUSION**     46

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

## TABLE OF CITATIONS

### CASES                                                                    PAGES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)                       16, 17

*Back v. Hastings on Hudson U.S.D.*, 367 F3d 107 (2d Cir. 2004)              27

*Bart v. Golub*, 96 F.4th 566 (2d Cir. 2024)                                 38, n.1, 44

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435 (2d Cir. 1999)                   27

*Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53 (1st Cir. 2018)          37

*Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129 (2d Cir. 2000)       20

*Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29 (2d Cir. 1994)             21

*Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000)         37

*Comcast Corp. v. Nat'l. Ass'n. of African American-Owned Media*,
    140 S.Ct. 1009  (2020)                                                   20

*Crawford v. Carroll*, 529 F.2d 961 (11th Cir. 2008)                        18

*Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196 (2d Cir. 1995)                 20

*Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004)                         43-44

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)   17

*Flowers v. Troup Cty., Sch. Dist.*, 803 F.3d 1327 (11th Cir. 2015)        37

*Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001)         20

*Lewis v. City of Union City, Ga.*, 918 F.2d 1213 (11th Cir. 2019)         36-38

*Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th Cir. 2019)    17-19, 21, 26, 28, 35, 39

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)    17

*McPhie v. Yeager*, No. 19-14914 (11th Cir. Jun. 25, 2020)    38

*Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)    18

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)    38

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004)    42

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)    1,17,19-20, 28, 42

*Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011)    18

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)    18, 19

*St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993)    36-37

*Texas Dept' of Comm'y Affairs v. Burdine,* 450 U.S. 248 (1981)    36

*Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428 (11th Cir. 1998)    37

*Tynes v. Fla. Dept. of Juvenile Justice,* 88 F.4th 939, 946 (11th Cir. 2023)    18

*Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763 (11th Cir. 2005)    19, 38

*Village of Arlington Heights v. MHDC*, 429 U.S. 252 (1977)    36

*Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998)    38

*Weinstock v. Columbia Univ.,* 224 F.3d 33 (2d Cir. 2000)    38, n. 1

*Ya-Chen Chen v. City Univ. of N.Y.,* 805 F.3d 59 (2d Cir. 2015)          42

## **STATUTES AND RULES**

28 U.S.C. section 1331          1

28 U.S.C. section1343          1

28 U.S.C. section 1291          1

28 U.S.C. section 1746          35

Fed. R. Civ. P. 56(a)          16

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to resolve this matter pursuant to 28 U.S.C. sections 1331 and 1343. Upon entry of the final decision/judgment below on July 1, 2024, appellant timely noticed his appeal on July 11, 2024, giving this Court jurisdiction pursuant to 28 U.S.C. section 1291.

## STATEMENT OF THE ISSUES

Did the district court err when it granted appellees' motion for summary judgment despite the facts that appellant made out a *prima facie* case, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) dictates that a district court not credit appellee's arguable reasons for an adverse action, and a reasonable jury could reject as pretextual and masking discrimination appellee's allegedly neutral reason for the adverse employment action?

## STATEMENT OF THE CASE

Appellant timely filed a charge of unlawful discrimination on or about July 15, 2020, received his right to sue letter on July 13, 2021, and timely initiated this action on September 30, 2021. On July 12, 2022, the Magistrate Judge

recommended denial of appellees' motion to dismiss for failure to state a claim. Docket No. 30 and, upon review of appellees' objections, on September 2, 2022, the District Court adopted that report and recommendation.

Discovery proceeded and on September 21, 2023, appellees moved for summary judgment. Appellant opposed that motion through the Declarations of plaintiff Adewumi and Dr. Paul King. Docket Nos. 94-95 and through submission of an extensive Rule 56.1 Statement disputing allegedly statements of material facts proffered by appellees. Docket No. 92. On April 16, 2024, the Magistrate Judge recommended grant of appellees' summary judgment motion. On April 29, 2024, Appellant timely filed objections which the district court denied in its decision adopting the Magistrate Judge's recommendation dated June 28, 2024. On July 11, 2024, appellant timely noticed this appeal.

## STATEMENT OF FACTS

Dr. Dare Adewumi [hereinafter "Adewumi"] is a highly trained and qualified physician, JA-364-365, JA-2710, para. 4, JA-2713, para. 16, JA-2831-34. In his prior employment, he never received a letter of inquiry or any form of performance improvement plan. JA-365, p. 26. Appellees hired him to re-start a neurosurgery department at Cobb Hospital [hereinafter "Cobb"]. JA-365, p. 27, JA-367, p. 31, JA-2711, paras. 10-11, JA-2013, para. 16.

At the time, appellee Wellstar Health Systems, Inc. [hereinafter "WHS"] owned and controlled both that hospital and the appellee Wellstar Medical Group [hereinafter "WMG"] which Appellant joined. JA-2710-11, para. 9.

In March 2018, Appellant commenced employment. He passed a probationary period during which his practice leader, Dr. William Benedict, [hereinafter "Benedict"] advised that each of his cases was reviewed by quality control. JA-2711, para. 11, JA- 2712, para. 15. Appellant received no letters of inquiry during this period and no one raised any issue with him regarding his standard of care. JA-2712-13, para. 15.

As he sought to establish a *bona fide* neurosurgery practice at Cobb, Adewumi received little support from the WMG which Benedict led. JA-2711, para. 10. "The expectation was that I would *always* be available. This was not an expectation that any of my white colleagues experienced as they worked together at Kennestone Hospital and covered for each other.  None was interested in covering for me and Benedict did not require members of the group to do this." JA-2710, para. 13.  With no back-up at Cobb, appellant's patients would be transferred to Kennestone Hospital if an emergency developed while he was off call. JA-1445. With no back-up, appellant covered well more than the five nights he was assigned to work each month. Id. Indeed, through the fall 2018, as Benedict knew, plaintiff signed up to cover almost every night. JA-1447.

On November 5, 2018, Benedict wrote, "Dr. Adewumi was charged with establishing neurosurgical services at a busy community hospital…He has done an excellent job establishing a high quality, safe and patient-centered neurosurgery service…I have no reservations recommending him as a diplomat of the American Board of Neurological Surgery." JA-1470.

At Cobb Hospital, where appellant was initially assigned, anyone can submit a complaint about patient care. Receipt of such a complaint prompts review of patient care and, if warranted, Quality Control sends a letter of inquiry to which the cited physician must respond. In this instance, Benedict reviewed complaints received about Adewumi and decided whether a letter of inquiry was warranted. JA-1471-72, 1477-78, JA-2714-15, paras. 19-21.

In his short time in Appellees' employ, Appellant had a startling nineteen such "letters of inquiry." After a physician responded to the letter of inquiry, Cobb Hospital physicians reviewed the cases and decided how to respond. If concerns were substantial, the Medical Executive Committee [MEC] could suspend privileges pending external review [by physicians associated with other institutions]. Dr. Adewumi's privileges were never so suspended.

In November 2018, Benedict began reviewing cases referred anonymously for peer review. Benedict swore that he only received charts after letters of inquiry

4

had been filed concerning Adewumi. JA-1297. The record belies this and shows that Benedict himself originated the letters of inquiry which reflected his alleged good faith concerns about appellant's medical practice. JA-2714, para. 20, JA-2795-2815, JA-2716, para. 25.

Benedict claimed that his chart review prompted him immediately to meet with Appellant and collegially discuss whatever he found. JA-1298. The record belies this and shows that, seven weeks after commencing his review, Benedict met with the Appellant for the first time in ten months and belittled the quality of his care. JA-2716, para. 26.

At this meeting, Adewumi explained that he needed greater support, including back-up, so he was not compelled to work, unlike other WMG members assigned to Kennestone Hospital, around the clock. Benedict provided no additional support. Adewumi explained, "…his tone and affect were anything but collegial…instead, he was demeaning and insulting as we discussed some of my cases and medical decisions I made. He attacked me for the letters of inquiry which he, in fact, had instigated [though at our meeting, he pretended their initiation was the work of others] and was highly belligerent. I explained the lack of support I had been receiving from supposedly aligned units like critical care, but he offered no support or guidance on how to obtain greater cooperation." JA-2716, para. 25.

5

Following this January 2019 meeting, Adewumi came to believe that Benedict harbored racial bias against him in that he treated him in a manner contrary to other WMG members. JA-2718, para. 30.

By the end of January 2019, Benedict had instigated eleven letters of inquiry relating to appellant. Later that month, Benedict appeared before the Cobb Medical Executive Committee [hereinafter "MEC"]. JA-2719-20, paras. 32 & 34. The same month, he suggested that Adewumi lighten his workload, but provided no back-up allowing appellant to responsibly do so. JA-2720, para. 36.

By mid-March, Benedict advised Dr. Alan Muster [hereinafter "Muster"] of WMS that he had "to move" appellant. JA-1486, JA-2722, para. 38. Muster was Benedict's superior and administered several specialties for WMS. JA-1253-54.

On March 16, Muster directed Benedict to write a draft action plan for appellant. JA-1485, JA-2722, para. 39. The following day, Benedict sent Muster a lengthy memorandum which made numerous false claims about appellant, suggesting, for instance, he might be receiving gifts or royalties for using certain spinal implants, and claiming appellant's "arrogance and elitism are a problem." JA-1487-88, 2722-23, para. 40. In the same memo, Benedict suggested transferring appellant to Kennestone for "at least three months" so he could be mentored by WMG physicians. JA-1488. Benedict represented that all WMG neurosurgeons

6

were "committed to help remedy the situation." JA-1488, JA-2723, para. 42. Two days later, Benedict again proposed transferring appellant to Kennestone, this time "for approximately six months," JA-1492-94, and so expose Adewumi to "the standard that Wellstar Neurosurgery has developed over the last several years," JA-1494, and provide him access to more experienced physicians. *Id.* & JA-2724, para. 45.

On March 22, 2019, Benedict and Muster met with appellant who opposed transfer and argued that his medical practice met community standards but that he did need more support and back-up. JA-2725, para. 47. At this meeting, Benedict and Muster admitted to failing to provide appellant with clear expectations or mentoring. *Id.*

On April 1, 2019, appellant met with Muster and advised him that Benedict harbored a bias against him. Appellant explained, "I expressed the view that Benedict seemed to distrust my ability to practice medicine based upon my race and background." JA-2726, para. 48. While obliged to do so, Muster did not report this concern to Jeffrey Hines who was then responsible for diversity and inclusion at Wellstar. JA-1753 at page 64.

Following this meeting, Muster wrote Benedict about his meeting with appellant, "he expressed a number of concerns about the MCE process, and he feels you have already determined that is he not going to succeed or are biased

against him." JA-1512. Benedict was "generally offended" by appellant's accusation and recognized this as a concern. JA-1748-49, at pages 55-56. In fact, upon learning of this, Benedict wrote, "Now I have to worry about accusations of bias." JA-1514. Benedict now complained about appellant's "lack of integrity." *Id.* Again, Benedict proposed removing appellant from Cobb and placing hm at Kennestone so he could be "observed daily" "until we can be sure his heart in the right place and his patients are his primary focus." *Id.*

Muster responded by proposing a plan which would provide appellant assistance in performing surgeries, shift complex operations to Kennestone and have appellant take half of his monthly calls at each hospital. JA-1499-1502, JA-2728, para. 54. But Benedict refused to implement this proposal, though starting in mid-April, appellant commenced taking call nights at Kennestone and another member of the WMG assisted him in performing surgeries at Cobb. JA-2729, para. 56.

On May 24, 2019, appellant explained to Muster that Benedict had sabotaged implementation of the plan, leading to him being even more overworked. JA-2729-30, para. 57. Appellant related to Muster that Benedict told him, "you and Alan Muster came up with this plan. My initial plan was to pull you completely for six months while I man Cobb, but this is the hybrid model that you and Alan wanted, and these are the duties you have to fulfill." *Id.*

8

On May 29, 2019, in an email to all group members but appellant, Benedict complained about the situation at Cobb, claimed that sharing calls there was not working and proposed terminating appellant from the group. JA-1518. Dr. Parry agreed that something different needed to be done at Cobb but made no reference to appellant burdening the group or any suggestion that he should be terminated. JA-1519.  Benedict responded to Parry, "My issue is whether integrity can be recalibrated." *Id.*

On June 11, 2019, Muster called appellant and urged him to resign, focusing prophetically of the risk that if Adewumi were required to perform an improvement plan and terminated before he could complete it, this would place his career in jeopardy. When appellant pressed Muster as to why he should resign, Muster noted that appellant was the subject of negative comments and "there is a sense you are not as committed as other folks feel. There is a sense you are not as present as other folks want…" JA-2733, para. 66, JA-2815-17 for transcript of this call.

After appellant spoke with Muster on June 11, 2019, and refused to resign, he awaited an action plan. JA-2736, para. 71. On June 18, appellant called Dr. Sharik Sayeed, the Chief of surgery at Cobb and his supervisor. Sayeed explained that the number of letters of inquiry had raised a red flag and that Benedict had presented issues which caused the MEC to seek external review which was pending. JA-2737. Sayeed told him that no action plan had yet been formulated.

9

The men discussed the possibility of appellant transferring to Kennestone for six months. Appellant stated that, while this would be humiliating, he would do so to salvage his career. *Id.*

The Cobb MEC ultimately received two external reviews of five cases. JA-2735, para. 69, JA-1700-1717. These reviews found no serious departures from any articulated standard of care. Dr. Benedict never saw the external review. JA-1295.

Appellees claim that, based upon the external reviews, the Cobb MEC placed Dr. Adewumi on an action plan and that Benedict and Muster did not play a pivotal role in development of this plan. Nothing could be further from reality.

While Benedict claimed that he was not involved in the development of, or even read, the action plan, JA-1293 at pages 98-99 and JA-1395 at page 303], on July 3, 2019, he wrote other members of WMG explaining its specific details and scheduling a meeting to discuss whether the group would support it. JA-1521, JA-2738, para. 73. At this meeting, "everybody agreed to support the process." JA-1397 at page 307. The plan required appellant to transfer to Kennestone for 4.5 months and work with WMG neurosurgeons who could mentor him and expose him to the group's standard of medical care. JA-1525.

Adewumi accepted the need to complete the multi-faceted improvement plan and began implementing it in July 2019. The action plan required him to take continuing medical education and other remedial courses which he promptly completed. JA-2739, para. 77

In mid-July 2019, appellant's primary place of employment shifted to Kennestone, where, during the next eleven weeks, he performed surgeries with other WMG neurosurgeons assigned to that hospital. JA-2739, para. 77. Appellant began covering for group members who otherwise would have been required to take such calls. These physicians reported no deviations by appellant from the group's standard of care and no specific issues of concern. *Id.* There were no letters of inquiry generated concerning his medical practice. JA-2751, para. 107.

The action plan contemplated follow-up meetings with Cobb administrators. JA-2738, para. 75. At two meetings held in July and September 2019, these administrators praised appellant's implementation of the action plan. JA-2740, para. 79.

Meanwhile, Benedict continued to torment appellant. He remarked that he would make Adewumi a resident again and had him perform duties like those assigned to an intern. JA-2740-41, para. 80.

Muster played no role in evaluating implementation of the action plan. He claimed not to have participated in any meeting with WMG doctors concerning its implementation. JA-1760-61 at pages 79-80.

Benedict claims that he recommended appellant's termination to Muster in October 2019 and that he had sent several emails outlining his reasons. JA-1287 at page 86, JA-1288 at page 89 and at JA-1291 at page 94. Appellees never produced any such emails and Benedict eventually conceded that none exists.

On October 8, 2019, unexpectedly, Dr. Muster gave appellant the required six-month notice that WMG would not renew his contract and directed that, during the next six months, he could not complete his action plan or otherwise continue to engage in medical practice with the group. At the time, Muster conceded, appellant was implementing all aspects of the action plan. JA-1832-33 at pages 223-24. He denied reviewing appellant's excellent patient satisfaction scores and never spoke with many of the doctors with whom appellant regularly interacted. Id.at 2644-45, para. 93.

When Appellant pressed him for reasons, Muster replied that appellant had not forged relationships with others early on at Cobb and that the action plan burdened others.  Muster told Adewumi that, before making this decision, he had met with all WMG members at Kennestone and that they all concurred with the

decision. JA-2744. But, the only African American member of that group, Dr. Humphrey, disputed this and called appellant's termination a "calculated hit," JA-2825, and denied being consulted in any way. JA-2826.

Before this meeting, no one had ever suggested to Appellant that implementation of the action plan burdened other members of the Neurosurgery Group and the claim was patently untrue. If anything, Appellant supported the doctors at Kennestone, lending a hand during surgeries. Adewumi explained, "I was on call every day and this alleviated the burden on other doctors. This is something one of them would have had to do if I did not do it and it was Dr. Benedict's idea. No one has explained how my taking call burdened another doctor." JA-2750 at para. 106. No member of the practice group conveyed to Adewumi that his performance burdened him, and, in two meetings after commencement of the improvement plan, Cobb administrators praised his performance.

While Muster swore that Benedict did not advocate for Appellant's termination, Benedict contradicted this, claiming that in several conversations in the fall of 2019, he advocated for Appellant's termination, listing a series of reasons which he certainly never raised or discussed with Appellant.

13

After Muster's decision to disassociate Adewumi from WMG, appellant still had privileges at Cobb Hospital, also owned and operated by Wellstar, the same company which owned WMG and had just advised him that it would not renew his contract. Thereafter, though the Cobb Hospital credentialing committee extended Adewumi's privileges to allow him to complete the action plan, appellant could not do because WMG disallowed him from practicing after mid-October 2019 and it was otherwise infeasible to implement the plan. When Dr. Paul King, an African American neurosurgeon from the Atlanta Medical Center, which was also part of WMS, sought to sponsor Dr. Adewumi so he could complete his action plan, Appellees refused to allow him to do so. JA-2848, para. 5  Appellant remained unemployed for several years following his termination.

Between December 2018 and June 2019, Benedict and Quality Control generated 19 letters of inquiry to Adewumi. These letters were based upon the opinion of one person, Benedict, the same person who isolated the Appellant, failed to provide him with support and advocated for his transfer from Cobb to Kennestone. After Appellant responded to the letters of inquiry, the vast majority of them were dropped with a finding that Appellant's care was "appropriate."

Dr. Paul King, another African American neurosurgeon, attested to similar treatment from appellees. "When Dr. Adewumi related the isolation and intensive peer review to which he was being subjected, this seemed very familiar to me.

14

When he explained that he was being asked to cover Cobb by himself and then being blamed for not being available around the clock, it sounded familiar." Dr. King explained that appellees treated him in much the same way and declined to allow him to practice at Kennestone. JA-2846-47.

To ensure "objectivity," and following appellant's complaint that Benedict was biased, Muster claims that he recommended that the Cobb MEC solicit an external review of appellant's charts. JA-2734, para. 65. Dr. Jodi Hughes from Cobb Hospital's administration disputed Muster's claim that he proposed an external review. JA-2735, para. 66.

On their summary judgment motion below, appellees explicitly deny that appellant's "without cause" termination related to the quality of his medical practice. This is unsurprising because both experts who reviewed the charts at appellees' behest concluded that Dr. Adewumi did not depart from any articulable standard of care in a single case.

Dr. Marcus Ware reviewed the charts referred for external review by the Cobb MEC and found no departures. JA-2436-45. Neurosurgeon Paul King also reviewed the charts for which Adewumi received letters of inquiry and, after noting that "in the vast majority of those cases, appellant's practice was deemed appropriate by the Cobb MEC," opined that the cases "present no deviations from

the standard of medical care in the community but reflect double standards applied to him and other African Americans who have worked with this group. I, too, was subjected to baseless peer review…" JA-2848, para. 4.

## **SUMMARY OF THE ARGUMENT**

Appellant contends that he made out a prima facie case of employment discrimination and the reason Muster advanced for the non-renewal of his contract was pretextual, to wit, a reasonable jury could conclude that he was not burdening neurosurgeons at Kennestone and that, rejecting this pretext, that he was terminated because of his race.

## **ARGUMENT**

## **I. STANDARD OF REVIEW**

Summary judgment is appropriate only if the moving party establishes there is no genuine dispute as to any material fact, entitling it to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if its resolution could affect the outcome of the suit and a dispute is genuine if reasonable minds may differ on its resolution. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If a reasonable jury could return a verdict for the non-moving party, summary judgment is inappropriate, and the court must deny the motion. *See Id.* at 250.

In evaluating the motion *de novo*, this court views the record in the light most favorably to the non-moving party, resolve all ambiguities and draw all permissible

factual inferences in his favor," *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013). In resolving a motion for summary judgment, the reviewing court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson, supra.* at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . ." *Id.* at 255, *Feliciano, supra.* at 1252, cited approvingly in *Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th Cir. 2019) ("*Lewis II*").

The court should review the record as a whole and, in doing so, "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeve, supra.* at 151 (2000).   As such, "the court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id.

## II. **SUBSTANTIVE STANDARDS**

Appellant alleges that Appellees discriminated against him on account of his race in violation of 42 U.S.C. section 1981-a. Such claims are evaluated under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *Lewis II, supra.* at 1185. Appellant must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a

protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside his class more favorably. *Lewis, supra.* at 1185 citing *Crawford v. Carroll*, 529 F.2d 961, 970 (11th Cir. 2008).

In *Lewis II* at 1185-86 (11th Cir. 2019), this Court clarified that comparator evidence is not a necessary element of a *prima facie* case if Appellant "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A plaintiff will always survive summary judgment is he presents ...a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." "A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements..., and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011), *overruled by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). This Court has affirmed the same repeatedly since. *See, Tynes v. Fla. Dept. of Juvenile Justice*, 88 F.4th 939, 946 (11th Cir. 2023)("It is also why "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith*, 644 F.3d at 1328. Indeed, "the plaintiff

will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*. at 1328. That is because *McDonnell Douglas* is "only one method by which the plaintiff can prove discrimination by circumstantial evidence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005). A plaintiff who cannot satisfy this framework may still be able to prove her case with what we have sometimes called a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1327-28 (footnote and quotation omitted); *see also Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*).)"

A *prima facie* case creates a presumption of discrimination which appellee may rebut by asserting a legitimate, non-discriminatory reason. *McDonnell Douglas, supra.* at 802.

If an Appellee meets its burden of production, appellant may prevail by demonstrating that the asserted reason is merely a pretext for unlawful discrimination. *See Id.; Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2000). While a plaintiff may establish pretext by showing that the defendant's asserted reason was false and that the real reason was the plaintiff's protected-class status, he is not required to disprove defendant's proffered reason; rather he need

only establish that defendant would not have acted but for the impermissible consideration. *See Reeves,* 530 U.S. at 147-48*; Comcast Corp. v. Nat'l. Ass'n. of African American-Owned Media*, 140 S.Ct. 1009, 1019 (2020); *Holtz v. Rockefeller & Co., Inc*., 258 F.3d 62, 81 (2d Cir. 2001); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995).

"Though the Appellant's ultimate burden may be carried by the presentation of additional evidence showing that the employer's proffered explanation was unworthy of credence, it may often be carried by reliance on the evidence comprising the prima facie case, without more. Thus, unless the employer comes forward with evidence of a *dispositive* nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the Appellant's evidence establishing a *prima facie* case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial." *Cronin,* 46 F.3d at 204 (quotations & citations omitted) (emphasis added); *See also Reeves*, 530 U.S. at 147-48; *Carlton v. Mystic Transportation, Inc.,* 202 F.3d 129, 136 (2d Cir. 2000) ("Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial. Summary judgment is appropriate at this point only if the employer's

nondiscriminatory reason is dispositive and forecloses any issue of material fact.");

*Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994).

## III. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT

On this record, appellees' motion for summary judgment should have been

denied. Appellant made out a *prima facie* case of discrimination and presented

substantial evidence from which a reasonable jury could conclude that he was

terminated for pretextual reasons, masking racial discrimination. Taken most

favorably to Appellant, he "has presented evidence from which a jury would be

entitled to conclude that the [Appellee's] actions were extraordinarily arbitrary."

*Lewis II, supra.* at 1185.

## A. APPELLANT ESTABLISHED A PRIMA FACIE CASE

No one contests that appellant is African American, was subjected to an

adverse employment action or had the qualifications to hold his position.  And the

totality of the evidence strongly supports the conclusion that Appellant was treated

less favorably than his Caucasian colleagues who populated Kennestone for WMG

and, indeed, was treated in an adverse and otherwise unexplained way, particularly

by Benedict. This evidence is relevant since, taken most favorably to appellant,

Benedict did recommend his termination to Muster in October 2019, as he had on

May 29, 2019, within two months of learning that appellant deemed him biased.

21

First, on March 22, 2019, both Muster and Benedict admitted to appellant that they had failed to provide him with orientation, training, and support. Instead, they left him isolated at Cobb and failed to provide him with the kind of support any physician new to a hospital and charged with starting a new practice area there would need.

Second, Dr. Benedict explicitly linked the demands on Appellant's time to likely "burn out," – his word, but then patently failed to arrange back-up for Appellant at Cobb by other WMG members. The Kennestone members backed each other up, reducing the demands on each of them but appellant was without that relief. Appellees' principal agents knew that this was creating tremendous demands upon him. Yet, they failed to support him and so treated him differently than similarly situated Caucasians.

Third, Appellant was subjected to numerous letters of inquiry following Benedict's chart reviews. These letters were *not* required because Benedict could have simply concluded that the demonstrated practice was within the standard of care. As Appellant's service leader, he also could have spoken collegially with the Appellant about any issues. In fact, at deposition, Benedict falsely claimed that he "immediately" did speak collegially with the Appellant upon becoming concerned about practice issues, reflecting his understanding of expected procedures in a hospital setting. But the record belies Benedict's account. He did not provide this

kind of basic supervisory support and guidance. Instead, he caused Quality Control, which relied upon him, to serve numerous baseless letters of inquiry upon the Appellant. Of course, regardless of their merit, this caused Appellant to have to respond in writing to each letter, adding further to the burdens Benedict claimed to know were already overwhelming him. This process also plainly created a negative reputation for appellant. [1]

Fourth, Adewumi observed substantial deviations in care by Caucasians within the WMG, raised these with both Muster and Benedict, but no letters of inquiry followed. Appellant explained that any time he sought to raise concerns about the medical practices of Dr. Parry, for example, Benedict would become very defensive and shut him down.

Fifth, the vast majority of the initial complaints and letters were found baseless, and Appellant's practice deemed "appropriate." Yet, the sheer numerosity of the letters, as Dr. Sayeed explained to Appellant, caused Cobb MEC great concern.

---

[1] In n. 6 of their moving Brief below, Appellees correctly note that the district court previously concluded that, "standing alone," it did not view the letters of inquiry and action plan as adverse actions. However, this does not detract from viewing these as critical components of the entire course of events to which Appellant was subjected when piecing together the mosaic which constitutes but for intentional discrimination

23

In short, a reasonable jury could conclude that Benedict created the circumstance which imperiled Appellant's practice and that no Caucasian was subject to the same micro-management though each was subject to the same care standards. And it could also find that, after advocating for the action plan, Benedict's lobbying in September 2019 caused Muster to terminate appellant and that Muster lied about that influence.

## B. APPELLANT ESTABLISHED PRETEXT

A reasonable jury could conclude that Muster and Benedict sought to place appellant on an improvement plan since early spring 2019 and developed the plan implemented by the Cobb MEC. In light of the acknowledged reliance by the Cobb MEC on Dr. Benedict during the preceding seven months [since January 24, 2019, when he first presented his findings to the MEC subcommittee dealing with quality control], a reasonable jury could conclude that, despite their denials, Benedict and Muster developed the Cobb MEC Hospital Action Plan.

While Muster admits that WMG altered the Cobb MEC plan, a jury could go further and find that the MEC lacked the subject matter expertise to craft the plan and that the WMG was more integrally involved in doing so. This was significant for what followed.

24

Having established the plan, one would expect that Benedict and the WMG would provide feedback concerning its implementation to the Cobb MEC which was administratively responsible for its implementation. Yet, there is no evidence of any reporting by WMG or Benedict to the Cobb MEC concerning Appellant's progress. Instead, in two meetings, held in July and September 2019, Dr. Hughes and Dr. Kuhlman of Cobb advised the Appellant that he was successfully completing the plan and that its duration might therefore be shortened.

Dr. Adewumi did not receive any letters of inquiry after initiation of the action plan nor any suggestion from WMG members that he was burdening them or not properly implementing the plan.

On October 8, 2019, in this context, Dr. Muster terminated Appellant. Appellees invoked the without cause provision for the non-renewal or termination. Muster claimed that implementing the action plan strained WMG members.  He provided no specifics, but told appellant that, at a meeting, all members agreed with the decision.   At the same meeting, Muster acknowledged that appellant was properly implementing the action plan.  Consistently, in his October 11, 2019 [post-termination] summary, Dr. Benedict acknowledged that Appellant had properly implemented the plan. And, of course, the Cobb MEC did not move to terminate the plan based on any known concerns.

A reasonable jury could see this for what it is – counter-factual and baseless pretext. As Adewumi explained in his Declaration, not only was no such issue ever raised or suggested – the same kind of extreme arbitrariness this Court found significant in *Lewis II* – the assertion was entirely baseless.  In fact, appellant was reducing the burden on WMG members by covering for them and by being present for surgeries and assisting, as for example, when Dr. Benedict could not place a catheter in a ventricle during surgery. There is simply no evidence that Appellant was a burden, and this appears to be a "hail mary," invoked by Appellees when they realized that any claim about Appellant's medical practice implicated disputed issues of fact which could never have predicated summary judgment.

In short, Appellees behaved arbitrarily when they terminated appellant after eleven weeks of successful implementation of the action plan. Never once after appellant began the plan did anyone advise him that he was not meeting its expectations or provide him with any notice of what he needed to better implement it. On the contrary, as noted above, those responsible for administering the plan told him the opposite – that he was doing well and might be more quickly discharged from the plan.

Finally, as noted above, a reasonable jury could find highly pretextual appellees' explanation of appellant's termination. First, did Benedict advocate for the termination [as he claims] or did he not [as Muster claims]. Did the men ever

discuss the subject? No, according to Muster. Yes, on several occasions in the fall, according to Benedict. Are Appellees, fully cognizant that Appellant told Muster on April 1, 2019, that he believed Benedict was biased, trying to distance Benedict from the decision? A reasonable jury could so conclude.

The same jury could also find non-credible Muster's denial that pressure from Benedict, the neurosurgery practice leader, caused him to act adversely against appellant and, instead, could conclude that Benedict's bias toward Appellant [as manifest by his conduct and his lying] affected the decision. And the "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision. . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 450 (2d Cir. 1999). *See, also, Back v. Hastings on Hudson U.S.D.,* 367 F3d 107, 126-28 (2d Cir. 2004).

Here, to the extent a jury concludes that Benedict was involved, as he claims to have been, in lobbying for Appellant's termination, it could further find that his bias infected the process.

For his part, to the extent a jury finds that Muster lied about the decisional process, attempting to distance Benedict from it, and then formulated and adduced

27

a pretextual reason for the action, i.e., Appellant was burdening WMG, it can conclude that he, and therefore, WHS, engaged in intentional racial discrimination. *Lewis II, supra.* at 1186.

Likewise, appellees' remaining arguments below each raised a matter for jury determination:

Appellees can submit to a jury that because Muster and Benedict hired other African American doctors, they did not discriminate in the terms and conditions of Appellant's employment. But Appellees acknowledge on page 18 of their brief in support of the motion for summary judgment that this is a "permissible inference," not a legally required conclusion. As set forth above, *Reeves, supra.* teaches that a jury can reject this inference and that, therefore, as a matter of law, summary judgment may not be granted on this ground.

Benedict's distorted presentation of appellant's cases is integral to this case, not a distraction as appellees submitted below. Presented with the evidence, a reasonable jury could conclude that Benedict knew he was the "subject matter" expert; that, therefore, he could effectively control the Cobb Hospital MEC's view of appellant; that he misstated his role at deposition in a failed attempt to shield it, claiming that he did not instigate the "letters of inquiry," when the opposite was true, and that he did so out of bias.

Likewise, Appellees continue to claim that Dr. Muster had nothing to do with the Cobb MEC even though Muster testified that he recommended to that entity that it hire an external reviewer after Adewumi expressed concerns about Benedict's bias. That members of the Cobb MEC deny that Muster ever made such a suggestion only complicates matters, but it does not show Muster played no role. Likewise, after denying any involvement in formulating the Cobb MEC action plan for Appellant, both Muster and Benedict finally admitted at depositions to reviewing "a draft" of the plan and recommending substantive changes which made it more palatable to the WMG.

WMS was Appellant's employer and controlled the WMG and Muster worked for WMS. Here, there is no question but that WMG is a component of WMS and that Muster claims to have run his decision by the legal department of WHS and its CEO. WHS has ultimate control of these employment relationships and Muster conceded this at his deposition. JA-1727.

## C. SPECIFIC ERRORS BY DISTRICT COURT

As against appellant's argument, as set forth above, the district court's decision is legally erroneous and it engaged in impermissible fact-finding and failed to take the evidence presented most favorably to the appellant, crediting

appellees' explanations for the adverse action which a jury is not compelled to accept.

First, even though appellees disclaim reliance on a "for cause" non-renewal and did not argue below that appellant engaged in medical practice which deviates from the community standard of care, the district court extensively discussed the letters of inquiry. It found as a fact that the external review of "the mortality case" concluded that Adewumi provided "inappropriate" care. This is inaccurate as is explained in appellant's response to paragraph 86 of the Appellees' Statement of Undisputed Facts. JA-2661. The reviewer never used the word "inappropriate" to describe the care appellant administered and never stated that appellant's practice deviated from any community standard of care. JA-2634-37.

Second, the district court credited appellees' claim that while plaintiff accused Benedict of "bias" on April 1, 2019, he never claimed his service leader was racially biased. Again, this finding misreads the record and ignores appellant's sworn declaration in which he expressly affirmed that during his discussion with Muster on April 1, 2019, "I expressed the view that Benedict seemed to distrust my ability to practice medicine based upon my race and background." JA-2776, para. 48. Adewumi also swore that he had spoken about racial bias to numerous colleagues at Cobb, JA-406-08, explaining, "I don't think any of my counterparts received any LOIs despite a lot of bad complications they had that I was aware of.

That was part of my concern about the discrimination, that I was bombarded with several LOIs that were filled with misstatements, lies. But then, when my white counterparts had cases that were clearly outside the standard of care and damaging patients, they were swept under the rug…And those were not addressed. Those were not discussed at all, and when I brought those to the attention of Dr. Muster and Dr. Benedict, nothing was done." JA-408 at page 129.

Third, the district court ignored the plain evidence that Benedict understood that Adewumi accused him of racial bias. Benedict vituperatively responded after Muster told him of this accusation by questioning appellant's integrity and wrote, "Now I have to worry about accusations of bias." JA-1514.

Fourth, the district court also erroneously concluded that Benedict and Muster supported an external review to assure objectivity when no one associated with the Cobb MEC, which ordered those reviews, attested to any such support. Indeed, in the next section of its opinion, the district court explained how the external reviews occurred.

Fifth, the district court decision omitted facts important to understanding the pretextual nature of Muster's articulated reason for non-renewal. At the termination meeting, Muster told appellant that his action plan was putting too much strain on the group and that "he had a meeting with all the members of the group and

everybody felt it was best to let me go." JA-466. However, no such meeting of the group took place and those who submitted Affidavits supporting the termination decision make no mention of any such process of meeting. And, one member of the group, the only African American, Dr. Humphrey, called the termination a "calculated hit," and denied having any input into this decision or attending any such meeting.

Sixth, the district court erroneously accepted the substance of appellees' Affidavits which sought to demonstrate that, despite his technical proficiency, Adewumi's action plan placed a burden on WMG members who had just agreed to the plan less than three months earlier. Much of the burden allegedly derived from an ineffable perception, supported by not a single verifiable fact, that appellant was "not internalizing the learning that the action plan was intended to instill." Neither Dr. Hsu nor Dr. Parry provided any examples of how this manifested; both acknowledged appellant's technical competence. No one explain the nature of the "burden" the mentoring imposed on any WMG member, certainly no one explained how the burden differed from that all team members agreed to shoulder in July 2019. Did any physician from WMG work an hour more because of Adewumi's action plan? Did any earn a penny less than they otherwise would have? How was the "burden" measured or manifest? And how could doctors who allegedly committed to implement this plan so suddenly turn on Adewumi?

32

Seventh, the district court did not note that it was implausible to assert and certainly highly arguable that others were more concerned about appellant's successful completion of the plan than he was. A reasonable jury could reject this alternative reality which appellees' witnesses advanced and conclude this was a fabricated narrative indicative of discriminatory intent.

Seventh, the district court also credited, though a jury need not, testimony from Dr. Muster that Benedict, who had long advocated for appellant's move to Kennestone, now complained that implementing the action plan was placing an unspecified "strain" on the neurosurgery team at Kennestone. This contravenes appellees' own SOF 139 which reads, "Dr. Muster does not recall Dr. Benedict having ever raised with him the prospect of terminating Plaintiff's WMG employment."

Eighth, the district court credited Benedict's post-terminating writing in which he claimed it was "clear" that Adewumi "felt as though he just had to get through the portion of the action plan being done at Kennestone" and "did not go out of his way to prove he was actually learning." A jury might understand these vague formulations for what they are – plain and contrived pretext, supported by no case-based evidence and written by a person who had long since expressed hostility toward appellant and baselessly questioned his integrity and character.

33

Rather than accept these highly arguable assertions as fact, the district court should have held that they at best presented issues for jury resolution. Most particularly, was the "burden" rationale sheer pretext, unsupported by anything, which masked the racial bias about which appellant complained? Was providing Adewumi with mentoring and support too difficult because of his race?

There is no evidence to support the conclusion that the action plan burdened WMG members or that this issue was ever raised with appellant while he implemented the program. Indeed, having him assigned to Kennestone was Benedict and Muster's idea for months, supported by other members of the group in early July 2019. And its implementation relieved other doctors of work. Appellees provided no data or evidence of any sort of any burden and one group member told plaintiff that his termination was a "calculated hit," and that contrary to Muster's representation that he had spoken to all WMG group members, no one spoke with him about any such issue.

The district court also erroneously overruled appellant's specific objections to the Magistrate Judge's recommendations: first, appellant's declaration commences, "Dr. Dare Adewumi, having been duly sworn, hereby declares under the pains and penalties of perjury..." and is duly executed. This complies with the requirement in 28 U.S.C. section 1746 and appellant's Declaration, as well as that of Dr. Paul King, which contains the same language, were impermissibly excluded.

Second, as explained above, the district court's determination that plaintiff has failed to identify a similarly situated comparator is not decisive, as it held, of the discrimination claim. *Lewis II* settled this.

As Adewumi explained at deposition, his white superiors ignored practice deviations by white peers, leaving him with a mountain of letters of inquiry, which predicated his action plan, and them with a seemingly spotless record.

But, of greater significance, identifying a comparator is only one way in which a claim of intentionally racial discrimination may be established. Appellant plainly made out a *prima facie* case of discrimination by showing that he was denied the same support white colleagues received and that his two superiors admitted this when they met with him in March 2019. The district court concluded that even if appellant were subjected to disparate terms and conditions of employment, not provided coverage or relief, expected to cover Cobb by himself when compared with the collegial relationships other group members enjoyed at Kennestone that would not establish a *prima facie* case of employment discrimination. This conclusion is clearly erroneous and immaterial since appellant was not required to identify a comparator under *Lewis II, supra*.

The district court cites *Lewis v. City of Union City, Ga.*, 918 F.2d 1213, 1222 (11th Cir. 2019) (*Lewis I*) for the proposition that any discrimination case must

involve a comparator. But *Lewis II, supra*, holds the contrary, explaining other means by which a discrimination plaintiff may prevail.  This is consistent with Supreme Court precedent.

It is well settled that intentional racial discrimination may be demonstrated in a myriad of ways, not merely by showing different treatment extended to a comparator. *Village of Arlington Heights v. MHDC*, 429 U.S. 252, 267-68 (1977)(noting that deviations from substantive principles or procedural regularity as well as invidious history may prove intentional race discrimination).

Nor is the rigid formulation of the elements of a *prima facie* case embraced by the district court a fair reflection of the controlling law. The Supreme Court has noted that at the first phase of the McDonnell-Douglas framework, "[t]he burden ... is not onerous," *Texas Dept' of Comm'y Affairs v. Burdine,450* U.S. 248, 253, 101 S.Ct. 1089 (1981), in fact is "minimal," *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742 (1993).

As the dissent correctly noted in *Lewis I, supra*.: "Following the Court's lead, we in the past have ourselves described the plaintiff's *prima facie* burden as "light," *Turlington v. Atlanta Gas Light Co.* , 135 F.3d 1428, 1432 (11th Cir. 1998), and as "a low bar to hurdle," *Flowers v. Troup Cty., Sch. Dist.* , 803 F.3d 1327, 1336 (11th Cir. 2015). Other Circuits have also observed that the *prima facie* case

requires only a "small showing" that can be "easily made," *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 57 (1st Cir. 2018), because it was "not meant to stymie plaintiffs," *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000). As the Supreme Court has explained, the prima facie phase anticipates that the plaintiff needs to make only a "generalized" showing of the elements of its case. *St. Mary's Honor Center, supra.*, at 516.

This "minimal" burden to make a "generalized" showing at the *prima facie* stage ensures the *prima facie* case acts as a hill and not a mountain in these notoriously difficult-to-prove cases. An employee often finds herself at a significant disadvantage to an employer when it comes to knowing the reasons for the employer's employment decision and to having access to information concerning both that decision and potential comparators. So we have recognized "that the prima facie case is designed to include only evidence that is objectively verifiable and either easily obtainable or within the plaintiff's possession." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005) (citing *Walker v.*

*Mortham*, 158 F.3d 1177, 1192–93 (11th Cir. 1998) ); *see also Price Waterhouse*, 490 U.S. 228 at 271, 109 S.Ct. 1775 (O'Connor, J., concurring)."[2]

Here, plaintiff alleges that he was similarly situated to other neurosurgeons for the purposes of making out a *prima facie* case because he belongs to a protected class; he was subjected to an adverse employment action; appellees treated him less favorably than others similarly situated outside his class and he qualified for the position. *Lewis I*, 918 F.3d at 1221, *McPhie v. Yeager*, No. 19-14914 (11th Cir. June 25, 2020).

Specifically, appellant is African American and was terminated after being placed on an action plan though he qualified for his position. Appellant submits that he was subjected to micro-management different from white neurosurgeons and that their medical errors were not subject to extensive scrutiny and the same kind of micro-management as his, though he brought them to the attention of Benedict and Muster. As other white peers were not subjected to multiple letters of inquiry despite cause, appellant was selectively placed on an action plan.

---

[2] This formulation is far more consistent with the standard for establishing a prima facie case set forth in Supreme Court precedent and used in other circuits. For instance, the Second Circuit's fourth prong is articulated as follows: "the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000), cited approvingly in *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024).

Put another way, appellant required the same kind of mentorship and training as white doctors who joined the Kennestone Hospital staff would typically receive but, in his case, appellee denied him that equal treatment. And then, contrary to the mentorship norm the WMG generally displayed, he was terminated because those in the group claimed that participating in such basic mentorship was too burdensome for those who, a short time earlier, had agreed to so proceed.

In short, appellant alleges he was subjected to different terms and conditions of employment than others from the outset.

But, contrary to the district court's erroneous conclusion, even if appellant cannot identify a single comparator because no one was subject to the same micro-management as he was, appellant can still make out a *prima facie* case. *Lewis II.* He can do so by showing the mosaic of intensely arbitrary treatment and the pretextual nature of appellees' explanation of his non-renewal. First, as explained above, appellees denied appellant support critical to the establishment of neurosurgery at Cobb. If appellees wanted him to succeed, why would they not have provided relief to avoid the burn-out evident from the extraordinary number of hours appellant was forced to work to meet Cobb's demands? A neutral actor, committed to patient care as Benedict and Muster proclaim they were, would have

insured a rotation of neurosurgeons at Cobb from the beginning both to provide

appellant with guidance on WMG's protocols and expectations and sufficient

assistance and relief. Instead, they did nothing to assist appellant. Benedict

repeatedly wrote appellant up, most often for procedures which were found to meet

the standard of care, and contrary to his claims, did not meet with him for two

months after he commenced reviewing charts.

Later, after agreeing to provide mentorship through the action plan, with no

effable or evident issue, WMG members turned on appellant. In so doing, they

deprived him of mutual support from other group members and, if Muster is to be

believed, caused his termination by expressing displeasure at the "burden"

involved in mentoring him. What makes this so pretextual is that no colleague

identified any practice deficiency or any case in which appellant failed to provide

proper care after the action plan commenced. Instead, their attitude echoed

Benedict's treatment of appellant between November 2018 and January 2019 -

when apprised of quality concerns, he did not, as he claimed he did, approach

appellant collegially. Benedict knew and articulated the proper response to such

concerns but did not exhibit that conduct toward appellant.

Having demonstrated different terms and conditions of employment, which his superiors conceded in March 2019 when they acknowledged that they had not mentored him or provided him the needed support at Cobb, and having terminated appellant after they approved a plan to redress their prior failure to mentor him, the explanation provided for his termination is clearly pretextual: mentoring him was "too burdensome" for members of the group who routinely are mentored when they arrive at Kennestone. And the nature and elements of the asserted burden remain vague and uncompelling such that a jury may view this reason as false and masking discriminatory intent.

A reasonable jury could conclude that appellees have disclaimed that they non-renewed appellant for cause, that is because of any demonstrable deficiency in patient care. Nor did any such matter arise during appellant's implementation of the action plan. Instead, through Alan Muster, appellee WMG terminated appellant because providing him the same kind of assistance as is typically occasioned during mentoring was for unexplained reasons deemed too burdensome when it came to appellant.

Applying *Reeves, supra.*, the district court should have determined that a reasonable jury was not required to accept the explanations for adverse action

41

appellees offered, that the explanation was instead suffused with inconsistencies, including the facts that (a) Benedict and Muster had advocated for just such an action plan for months; (b) all WMG group members had just recently agreed to its implementation and to provide the attendant mentoring, (c) there is no documentation showing that mentoring appellant imposed any burden on anyone, let alone the WMG and (d) the Affidavits adduced in support of this reason are vague and conclusory, mention no discussion with appellant of any such burden and that there is no evidence to support that assertion.

It is well-settled that a finder of fact may infer discriminatory intent from assertion of false reasons. *Ya-Chen Chen v. City Univ. of N.Y.,* 805 F.3d 59, 76, n. 13 (2d Cir. 2015)("The plaintiff can survive summary judgment by showing that the employer's stated reason for the adverse employment action is entirely pretextual, or that the employed had mixed motives, one of which was the desire to discriminate."), *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004) (plaintiff can defeat summary judgment by showing "that the defendant's reason is not true and is instead a pretext for discrimination" or by showing that even if true, it is only one of the reasons for its conduct and another motivating factor is plaintiff's protected characteristic). Here, the sequence of events, which includes

WMG's alleged support for implementation of the action plan which mirrored others Benedict and Muster previously advocated, makes suspect the claim that implementing the plan was burdensome. This is particularly true because no one called into question appellant's technical or medical competency during the eleven weeks he implemented the plan or suggested that WMG physician expended their time teaching appellant anything.  All of this may lead a factfinder to the conclusion that appellees' reason was demonstrably false, supporting his claim of racial discrimination.

Nor does the claim that appellant was not invested in his success, a different argument which is apparent from appellees' submission, lead to a different result. To the contrary and indisputably, appellant promptly fulfilled the CME and remedial educational requirements which the plan required of him and assiduously addressed his responsibilities at Kennestone.  A reasonable jury could find these explanations baseless and equally pretextual, allowing a "rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004), cited approvingly in *Bart v. Golub Corp.*, 96 F.4[th] 566, 576 (2d Cir. 2024)

Finally, Muster's claim that a meeting was held where this resolution was unanimously approved by WMG members is demonstrably false, contradicted by the only African American member of the group, Dr. Humphrey, and not supported by the Affidavits appellees supported on their motion.

Finally, the district court erred by failing to find that a reasonable jury could reject Muster's explanation for his decision as baseless, pretextual and masking discriminatory intent. This contravenes the fundamental teaching of *Reeves, supra*. The district court affirmed the Magistrate Judge's recommendation on pretext with minimal analysis, but, as shown above, the vague formulation of burden could be easily rejected since the plan was one endorsed by Muster three months earlier, there was no evidence that appellant had been a burden or otherwise caused any issue at Kennestone, no one contemporaneously indicated as much as would be expected when dealing with such sensitive surgeries, and, instead, all attested to appellant's professional competence and technical mastery.

In this light, a claim of burden at best raises a disputed issue of fact, not an ineluctable and decisive assertion which a jury would need to adopt.

## **CONCLUSION**

Since, taking the record as a whole, Appellant can demonstrate to a jury that he was treated in an extraordinary arbitrary manner, that the reason provided for his termination was steeped in pretext, that he had no notice of any issue with regard to the successful completion of his action plan, certainly never being advised that he was thereby burdening anyone, that the WMG members all agreed eleven weeks before his termination to its implementation and that thereafter no event/s occurred which could reasonably have justified his termination.

The pretextual nature of this explanation, when combined with the cited history of animosity from Dr. Benedict and his likely influence in the termination process, while denied by Muster, merited denial of this motion below.

Accordingly, the order granting the motion for summary judgment should be vacated and this matter tried to a jury.

Dated: August 19, 2024

Respectfully submitted,

Michael H. Sussman

SUSSMAN & GOLDMAN
1 Railroad Avenue
Goshen, NY 10924
(845)-294-3991
Attorneys for Appellant, Dr. Dare Adewumi

45

## CERTIFICATE OF COMPLIANCE

I, Michael H. Sussman, Esq., counsel for appellant, hereby certifies that the annexed opening brief has been prepared on a desk top computer using 14-point Times Roman font and contains 9,804 words and thereby complies with F.R.A.P. 32.

_____

MICHAEL H. SUSSMAN, ESQ.

## CERTIFICATE OF SERVICE

MICHAEL H. SUSSMAN, Esq., counsel for appellant, hereby certifies that on August 19, 2024, I caused to be mailed, postage prepaid, two copies of the annexed Opening Brief to William Bradley Hill, Jr., Esq., Seyfarth & Shaw, LLP, 1075 Peachtree Street, N.E., Suite 2500, Atlanta, Ga. 30309, counsel for appellees in the within appeal.

Dated:  August 19, 2024

MICHAEL H. SUSSMAN, ESQ.