APPEAL NO. 24-12243

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

**DARE ADEWUMI**

*Plaintiff-Appellant*,

v.

**WELLSTAR MEDICAL GROUP AND
WELLSTAR HEALTH SYSTEMS, INC.**

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CIVIL ACTION FILE NO. 1:21-CV-04048-CAP

_____

**APPELLEES' BRIEF**
_____

William B. Hill, Jr
wbhill@seyfarth.com
Daniel P. Hart
dhart@seyfarth.com
Kelly J. Koelker
kkoelker@seyfarth.com
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, GA  30309-3958
Telephone: (404) 885-1500
Facsimile: (404) 892-7056
Counsel for Appellees

**APPELLEES' CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record for Appellees certify that the following is a full and complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

Adewumi, Dr. Dare (Plaintiff-Appellant)

Fuller, Hon. J. Clay (Magistrate Judge, U.S. District Court for the Northern District of Georgia)

Hart, Daniel P. (Attorney for Defendants-Appellees)

Hill, William B., Jr. (Attorney for Defendants-Appellees)

Hoffler, Tricia (CK) (Attorney for Plaintiff-Appellant)

Koelker, Kelly J. (Attorney for Defendants-Appellees)

Pannell, Hon. Charles A., Jr. (Judge, U.S. District Court for the Northern District of Georgia)

Seyfarth Shaw LLP (Counsel for Defendants-Appellees)

Sussman, Michael H. (Attorney for Plaintiff-Appellant)

Sussman & Associates (Counsel for Plaintiff-Appellant)

The Hoffler Firm (Counsel for Plaintiff-Appellant)

Wellstar Medical Group, LLC (Appellee)

Wellstar Health System, Inc. (Appellee)

## APPELLEES' CORPORATE DISCLOSURE STATEMENT

Appellees certify that no publicly held company or corporation owns ten percent (10%) or more of its or their stock or otherwise has an interest in the outcome of this appeal.  Appellees further certify that they are not aware of any other identifiable legal entities related to a party that have an interest in the outcome of this appeal.

**APPELLEES' STATEMENT REGARDING ORAL ARGUMENT**

Appellees do not request oral argument. Although Appellant misstates much of the factual record and largely relies on inapplicable out-of-circuit authority, the record on appeal demonstrates that the District Court correctly applied controlling authorities from this Circuit to the material undisputed facts. Accordingly, Appellees submit that oral argument will not assist the Court in deciding this matter and that the issues on appeal may be decided upon consideration of the parties' briefs and the record on appeal.

Should the Court grant oral argument, however, Appellees of course respectfully request the opportunity to participate.

# TABLE OF CONTENTS

APPELLEES' CERTIFICATE OF INTERESTED PERSONS ............................... i

APPELLEES' CORPORATE DISCLOSURE STATEMENT ............................... ii

APPELLEES' STATEMENT REGARDING ORAL ARGUMENT ..................... iii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF CITATIONS ...................................................................... vii

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION .................................................................................. 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE: COURSE OF PROCEEDINGS AND
DISPOSITION IN THE COURT BELOW ................................................ 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................ 3

    1.    Defendants Wellstar Health System, Inc. and Wellstar
        Medical Group, LLC .................................................................. 3

    2.    Cobb's Organization and Governance ........................................ 4

    3.    Cobb's Peer Review Process ..................................................... 4

    4.    Adewumi's Recruitment and Hiring by WMG to Lead the
        Neurosurgery Practice at Cobb .................................................. 7

    5.    Cobb's Application of Its Peer Review Process to
        Adewumi ................................................................................ 9

    6.    The March 2019 Mortality Case ............................................... 11

    7.    Continued Peer Review Concerns .............................................. 12

    8.    Cobb's Decision to Place Appellant on an Action Plan ............. 14

    9.    The Need for "Buy-In" by the Kennestone Neurosurgery
        Group ..................................................................................... 15

    10.    Appellant's Performance Under the Action Plan ..................... 17

11.    Termination of Adewumi's WMG Employment......................20

12.    Evidence Regarding Alleged Comparators..............................22

SUMMARY OF THE ARGUMENT .......................................................23

STANDARDS OF REVIEW .................................................................24

LEGAL STANDARDS APPLICABLE TO § 1981 CLAIMS ..............25

ARGUMENT .......................................................................................28

I.    APPELLANT'S STATEMENT OF FACTS VIOLATES THIS
      COURT'S AND THE DISTRICT COURT'S RULES................................28

      A.    Appellant's Statement of Facts Violates This Court's Rules..............28

      B.    The District Court Properly Disregarded Appellant's Evidence
            Submitted in Violation of Its Local Rules, and Appellant Has
            Forfeited Any Argument to the Contrary.............................................30

II.   APPELLANT DID NOT SHOW TRIABLE EVIDENCE OF
      INTENTIONAL DISCRIMINATION UNDER MCDONNELL
      DOUGLAS .....................................................................................32

      A.    Appellant Failed to Show a Prima Facie Case of Race
            Discrimination. ...................................................................................32

      B.    Appellant Failed to Show That the Articulated Legitimate,
            Nondiscriminatory Reason for the Termination of His
            Employment Contract Was a Pretext for Intentional Race
            Discrimination. ...................................................................................37

            1.    WMG Articulated a Legitimate Nondiscriminatory Reason
                  for Terminating Appellant's Employment Contract................38

            2.    Appellant Offered No Evidence of Pretext.............................39

            3.    The Record Suggests the Absence of Pretext. .........................45

III.  APPELLANT DID NOT SHOW A TRIABLE INFERENCE OF
      DISCRIMINATION UNDER THE "CONVINCING MOSAIC"
      APPROACH .....................................................................................46

A.    There Is No Evidence of Ambiguous Statements or Suspicious Timing. ........................................................................................47

B.    There Is No Evidence of Systematic Favorable Treatment of Similarly Situated Non-African-American Employees. ....................48

C.    There Is No Triable Evidence of Pretext............................................50

IV.    NONE OF APPELLANT'S LIST OF ALLEGED "SPECIFIC ERRORS" BY THE DISTRICT COURT REQUIRES REVERSAL .........51

CONCLUSION ....................................................................................................55

CERTIFICATE OF COMPLIANCE .......................................................................56

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Albert-Aluya v. Burlington Coat Factory Warehouse Corp.*,
    470 F. App'x 847 (11th Cir. 2012) ....................................................39

*Alvarez v. Royal Atl. Devs., Inc.*,
    610 F.3d 1253 (11th Cir. 2010) ......................................................41

*Berry v. Crestwood Healthcare LP*,
    84 F.4th 1300 (11th Cir. 2023) ......................................................46

*Brooks v. County Comm'n of Jefferson County*,
    446 F.3d 1160 (11th Cir. 2006) ......................................................39

*Burke-Fowler v. Orange Cnty., Fla.*,
    447 F.3d 1319 (11th Cir. 2006) ......................................................35

*Celotex Corp v. Catrett*,
    477 U.S. 317 (1986) ......................................................................24

*Chapman v. AI Transp.*,
    229 F.3d 1012 (11th Cir. 2000) (en banc) ......................................38

*Cheatwood v. City of Vestavia Hills*,
    No. 21-13680, 2022 WL 2921304 (11th Cir. July 26, 2022) ............41

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    140 S. Ct. 1009 (2020) ..................................................................25

*Cooper v. Jefferson Cnty. Coroner & Med. Exam'r Off.*,
    861 F. App'x 753 (11th Cir. 2021) ................................................45

*Cotton v. Enmarket, Inc.*,
    809 F. App'x 723 (11th Cir. 2020) ................................................34

*Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*,
    47 F.3d 1068 (11th Cir. 1995) ......................................................40

*Duncan v. Alabama*,
    734 F. App'x 637 (11th Cir. 2018) ................................................43

*Flowers v. Troup Cnty., Ga., Sch. Dist.*,
  1 F. Supp. 3d 1363 (N.D. Ga. 2014), *aff'd*, 803 F.3d 1327 (11th
  Cir. 2015) ...................................................................................47

*Furcron v. Mail Ctrs. Plus, LLC*,
  843 F.3d 1295 (11th Cir. 2016) .........................................................24

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009)..........................................................................26

*Hester v. Univ. of Alabama Birmingham Hosp.*,
  798 F. App'x 453 (11th Cir. 2020) ....................................................35

*Hill v. Oil Dri Corp. of Ga.*,
  198 F. App'x 852 (11th Cir. 2006) ....................................................36

*Holifield v. Reno*,
  115 F.3d 1555 (11th Cir. 1997) .........................................................42

*Holland v. Gee*,
  677 F.3d 1047 (11th Cir. 2012) .........................................................26

*Jefferson v. Sewon Am., Inc.*,
  891 F.3d 911 (11th Cir. 2018) ...........................................................26

*Jenkins v. Nell*,
  26 F. 4th 1243 (11th Cir. 2022) .........................................................51

*Kennedy v. Kelly Temp. Servs., Inc.*,
  95 F. Supp. 2d 1288 (M.D. Ala. 2000) ..............................................34

*Kragor v. Takeda Pharms. Am., Inc.*,
  702 F.3d 1304 (11th Cir. 2012) .........................................................38

*Lamar v. Lahood*,
  2012 WL 12884917 (N.D. Ga. Oct. 10, 2012) ..................................30

*Lewis v. City of Union City*,
  918 F.3d 1213 (11th Cir. 2019) (en banc) ..................................*passim*

*Lewis v. City of Union City*,
  934 F.3d 1169 (11th Cir. 2019) ...................................................46, 51

*Lewis v. Residential Mortg. Sols.*,
    2018 WL 5276221 (N.D. Ga. Aug. 31, 2018), *report and
    recommendation adopted,* 2018 WL 5276190 (N.D. Ga. Oct. 16,
    2018), *aff'd,* 800 F. App'x 830 (11th Cir. 2020) .................................30

*Mann v. Taser Int'l, Inc.*,
    588 F.3d 1291 (11th Cir. 2009) ...........................................24, 25, 31

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)......................................................................*passim*

*McNeal v. Int'l Paper*,
    No. 21-12672, 2022 WL 5434274 (11th Cir. Oct. 7, 2022) ..............38

*McQueen v. Alabama Dep't of Transp.*,
    769 F. App'x 816 (11th Cir. 2019) ....................................................37

*Nix v. WLCY Radio/Rahall Commc'ns*,
    738 F.2d 1181 (11th Cir. 1984) .........................................................42

*Ossmann v. Meredith Corp.*,
    82 F.4th 1007 (11th Cir. 2023) .........................................................27

*Paylor v. Hartford Fire Ins.*,
    748 F.3d 1117 (11th Cir. 2014) ........................................................24

*Poer v. Jefferson Cnty. Comm'n*,
    100 F.4th 1325 (11th Cir. 2024) .................................................*passim*

*Reese v. Herbert*,
    527 F.3d 1253 (11th Cir. 2008) ........................................................31

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)...................................................................41, 44

*Robinson v. Habersham Cnty.*,
    No. 2:20-CV-108-SCJ-JCF, 2022 WL 22640356 (N.D. Ga. July
    26, 2022), *report and recommendation adopted sub nom. Robinson
    v. Sutton,* No. 2:20-CV-00108-SCJ, 2022 WL 22638522 (N.D. Ga.
    Sept. 23, 2022) ...................................................................................25

*Rojas v. Florida*,
    285 F.3d 1339 (11th Cir. 2002) ..................................................29, 41

*Sims v. MVM, Inc.*,
  704 F.3d 1327 (11th Cir. 2013) .......................................................................25

*Singh v. United States*,
  561 F.3d 1275 (11th Cir. 2009) .......................................................................32

*Smith v. Lockheed-Martin Corp.*,
  644 F.3d 1321 (11th Cir. 2011) .......................................................................27

*Springer v. Convergys Customer Mgmt. Grp. Inc.*,
  509 F.3d 1344 (11th Cir. 2007) .......................................................................39

*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993) .................................................................................27, 33

*Taylor v. Teakdecking Sys., Inc.*,
  571 F. App'x 767 (11th Cir. 2014) ...................................................................38

*Tex. Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981) .................................................................................27, 33

*Tynes v. Fla. Dep't of Juv. Just.*,
  88 F.4th 939 (11th Cir. 2023) .....................................................................26, 27

*United States v. Al Jaberi*,
  97 F.4th 1310 (11th Cir. 2024) ...................................................................29, 37

*United States v. Campbell*,
  26 F.4th 860 (11th Cir.), *cert. denied,* 143 S. Ct. 95 (2022) .............................31

*Ward v. Troup Cnty. Sch. Dist.*,
  856 F. App'x 225 (11th Cir. 2021) ...................................................................39

*Webster v. Fulton Cnty.*,
  283 F.3d 1254 (11th Cir. 2002) .......................................................................25

*West v. City of Albany, Georgia*,
  830 F. App'x 588 (11th Cir. 2020) ...................................................................36

*Williams v. Slack*,
  438 F. App'x 848 (11th Cir. 2011) ...................................................................25

*Williams v. Vitro Servs. Corp.*,
   144 F.3d 1438 (11th Cir. 1998) ...........................................................45

*Wilson v. B/E Aerospace, Inc.*,
   376 F.3d 1079 (11th Cir. 2004) ...........................................................33

*Ziyadat v. Diamondrock Hosp. Co.*,
   3 F.4th 1291 (11th Cir. 2021) .....................................................42, 43

**Statutes**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1746 .............................................................................2, 32

42 U.S.C. § 1981 .........................................................................*passim*

**Other Authorities**

11th Cir. R. 28-1 ...............................................................2, 28, 29, 40

11th Cir. R. 30-1 ...................................................................................1

Fed. R. Civ. P. 56 ................................................................................24

L.R. 56.1...............................................................................25, 30, 31

L.R. 83.1................................................................................................30

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

Pursuant to 28 U.S.C. § 1331, the District Court and this Court have subject matter jurisdiction over Appellant's federal question claim alleging race discrimination under 42 U.S.C. § 1981.

Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction over this appeal from the District Court's June 28, 2024, Order dismissing Appellant's claims (JA-2418) and July 1, 2024, entry of final judgment thereon (JA-2448), from which Appellant timely filed a Notice of Appeal on July 11, 2024 (JA-2449).[1]

## STATEMENT OF THE ISSUES

1.    Did the District Court correctly grant summary judgment on Appellant's § 1981 discriminatory termination claim where the undisputed material facts (a) do not establish a *prima facie* case of intentional race discrimination because there is no comparator evidence, and (b) do not show that the legitimate,

---

[1] When record cites are provided in Appellant's Opening Brief ("AOB") (11th Cir. Doc. 18), they refer to pages from the consecutively numbered Joint Appendix ("JA") that Appellant filed (11th Cir. Doc. 21-27). Appellees likewise cite to the JA, except as to documents that will be contained in Appellees' Supplemental Appendix ("SA") (to be filed pursuant to 11th Cir. R. 30-1), which are cited herein by the District Court's assigned document number. Appellees use the respective court's page numbering system, rather than the document's internal page numbers. As discussed further in part IV below, AOB frequently cites nonexistent pages within the JA, specifically, JA page numbers higher than 2700. Despite requests from Appellees' counsel, Appellant has not submitted the missing pages of the JA.

non-discriminatory reason for terminating Appellant's employment contract was a pretext for intentional race discrimination?

2.    In connection with granting summary judgment, did the District Court properly exercise its discretion to disregard Appellant's affidavits totaling more than 50 pages (with over 100 pages of attachments) that were not submitted in compliance with the Northern District of Georgia's rules governing presentation of evidence on summary judgment motions and that were not properly executed under 28 U.S.C. § 1746?

**STATEMENT OF THE CASE:**
**COURSE OF PROCEEDINGS AND**
**<u>DISPOSITION IN THE COURT BELOW</u>**

This is a straightforward § 1981 employment discrimination case brought by Appellant, an African-American neurosurgeon, against the physician practice group that employed him and a hospital system where he had medical privileges.

Appellant's Statement of the Case (AOB at 9-10) adequately summarizes the Course of Proceedings and Disposition in the Court Below required by 11th Cir. R. 28-1(*i*)(i) with one exception. In granting summary judgment on Appellant's § 1981 claim, the District Court also dismissed Appellant's Title VII claim, finding that he failed to file a timely charge of discrimination with the EEOC. (*See* JA-2311 (Magistrate's Report and Recommendation ("R&R"); JA-2418 (District Court's Order). Appellant does not appeal this ruling.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Defendants Wellstar Health System, Inc. and Wellstar
    Medical Group, LLC

Defendant Wellstar Health System, Inc. ("WHS" or the "System"), is a non-profit health care system comprised of a number of "affiliated" hospitals, including Cobb Hospital ("Cobb") and Kennestone Regional Medical Center ("Kennestone"). (JA-913, Deposition of Dr. William Benedict 24-25; JA-1115, Deposition of Dr. Jody Hughes 11; JA 1254-56, Deposition of Dr. Alan Muster 13, 18-19; JA-1600-01, Declaration of Joey Hunt ¶¶ 3-4.)

Defendant Wellstar Medical Group, LLC ("WMG"), is a physician practice group that employs doctors (and other health care professionals) in various practice areas and specialties who have privileges to work at the System's affiliated hospitals. (JA-1254, Muster 12-13; JA-911-12, Benedict 17-19; JA-1601, Hunt ¶ 7.) WMG is a separate entity from WHS, Cobb, and Kennestone.[2] (JA-1601, Hunt ¶ 7.) Dr. Alan Muster, Senior Vice President, WMG Specialty Division, oversees various WMG practice groups, including the neurosurgery practice group, and as such he has final hiring decision over physicians within that group. (JA-1254-56, 1260-61, Muster 11-20, 35, 38-39.) The practice lead of the WMG neurosurgery practice

---

[2]  Because the District Court granted summary judgment on Appellant's discrimination claim, it did not decide Appellees' argument that WMG and WHS were not Appellant's joint employers and that WHS therefore cannot be liable for Appellant's employment discrimination claim. (*See generally* JA-2418, Doc. 108.)

group is Dr. William J. Benedict, who is also the neuroscience service line leader. (JA 1256, Muster 20-21; JA-915, Benedict 30.)

### 2.    Cobb's Organization and Governance

Cobb's Medical Executive Committee ("Executive Committee" or "MEC"), comprised of elected hospital physicians, oversees medical staff at the hospital, including the peer review process and credentialing (privileges) issues, pursuant to the hospital's Medical Staff Bylaws. (JA-914, Benedict 27-29; JA-1469-70, 1472, 1483, Dr. Vidya Soundararajan Declaration ¶¶ 6-7, 16 & Ex. A.) During relevant times, the Cobb MEC was chaired by Dr. Vidya Soundararajan and Dr. Chad Kuhlman in their role as Cobb Medical Staff President. (JA-1179-80, 1191, Deposition of Dr. Chad Kuhlman 9-11, 12-13, 55; JA-1124, Hughes 47; JA-1468-70, Soundararajan ¶¶ 2, 6.) At relevant times, vascular surgeon Dr. Shariq Sayeed was the Surgery Department Chair and Chair of the Cobb Surgery Medical Care Evaluation ("MCE") Committee. (JA-1624, Dr. Shariq Sayeed Declaration ¶ 2.) As such, Dr. Sayeed was responsible for the overall supervision of work within the Surgery Department. (JA-1626, Sayeed ¶ 4; JA-1275, Muster 96.)

### 3.    Cobb's Peer Review Process

Cobb's hospital-based Peer Review Process is "the procedure . . . by which the quality and efficiency of services ordered or performed by individual Medical Staff Members . . . are evaluated . . .  to determine whether health services rendered

were professionally indicated, were performed in compliance with the standards of care, or were performed in compliance with applicable laws, rules and regulations." (JA-1475-76, 1524-24, Soundararajan ¶ 32 & Ex. B, Section 1.17.) Peer review is conducted locally under the oversight of each respective hospital's MEC and any committees or subcommittees it forms for that purpose. (JA-1469-70, Soundararajan ¶¶ 6-7, 16; JA-1255-56, Muster 17-18; JA-914, Benedict 26-28.) Thus, Kennestone's peer review process is separate from Cobb's. (JA-1469-70, 1472, Soundararajan ¶¶ 4, 6, 16.) Because Neurosurgery is part of the Surgery Department at Cobb, the Cobb Surgery MCE is responsible for review of neurosurgery outcomes at Cobb, including Appellant's. (JA-1624, Sayeed ¶¶ 2, 4-5.)

At Cobb, cases can be referred for peer review through "innumerable routes." (JA-1119, Hughes 27.) One way that cases reach a peer review committee is through "unanticipated [patient] outcomes." (*Id.* at 27-28.) Specifically, under the "Wellstar Medical Staff Professional Practice Evaluation Policy" ("PPE Policy"), certain "Review Indicators" trigger *mandatory* or *automatic* Quality Improvement ("QI") Coordinator review including death of a patient, return to the OR, and site infection. (JA-1478, 1534, Soundararajan ¶ 41 & Ex. B, Section 4.1(c)(i); JA-848, Adewumi II, Ex. 57.) Cases may also enter the peer review process through "an anonymous reporting matrix" known as "SaFER," by which any individual can report any concerns about a medical professional's performance. (JA-1119, Hughes 28.)

When a matter is referred to the peer review process, it goes through an initial review by nurses who document all relevant facts. (JA-1258-59, Muster 29-30; *accord* JA-1536, Soundararajan, Ex. B [PPE Policy Section 5.1(b)(i), (ii)].) After initial QI review, QI typically brings the matter to the MCE Committee (i.e., relevant peer review committee) chair for further screening. (JA-1258-59, Muster 29-30.) If the designated peer review screener has concerns upon performing an initial evaluation, the reviewer sends it to the MCE Committee for a full evaluation. (JA-1120, Hughes 30.) In some circumstances, the MCE Committee might not have the necessary expertise, and it therefore asks for assistance from a doctor within the particular specialty involved in the peer review case. (JA-1259, Muster 30-31.) This is often a service line leader from another WHS hospital. (*Id.*)

As detailed below, because Appellant was the only neurosurgeon in the Cobb Surgery Department (as he had been hired specifically to restart the practice line there), the department did not have the neurosurgical expertise to evaluate his peer review cases. (JA-1257, Muster 24; *accord* JA-943, Benedict 143-44.) The Cobb MCE Committee therefore consulted with Dr. Benedict, in his role as neurological surgery service line leader at Kennestone, to screen Appellant's peer review cases. (*Id.*)

When peer review matters are elevated to the MCE Committee for review, the Committee can take a number of actions, including finding that the care given was

"Appropriate," identifying "Findings of Concern," and requesting a Letter of Inquiry ("LOI"). (JA-1536, Soundararajan, Ex. B; JA-1121, Hughes 34-35.) A LOI is generated when the committee "has questions about the care that was provided, and they specify those questions" to the physician who provided the care and give him or her the opportunity to answer them. (JA-1259, Muster 32; *see also* JA-363, Adewumi I 42.) LOIs are sent by the QI Coordinator, and the doctor is given 21 days to provide a response. (JA-1537, Soundararajan, Ex. B.) After the 21-day response period has expired, the applicable Cobb MCE Committee reviews that peer review file again and makes a final decision as to whether the care was "Appropriate," "Questionable," or "Inappropriate" (the "Final Decision"). (JA-1536-37, Soundararajan, Ex. B.)

4.    Adewumi's Recruitment and Hiring by WMG to Lead the Neurosurgery Practice at Cobb

In approximately 2015-2016, Dr. Benedict began focusing on developing a neurosurgery line at Cobb. (JA-915, Benedict 31-32.) Before Appellant (and, later, Drs. Marcus Gates and Saint-Aaron Morris[3]) was hired at Cobb, a person who came to the Cobb emergency department with potential neurosurgery needs typically was transferred to Kennestone. (JA-913, Benedict 23-24.) Because of the volume of

_____

[3] Dr. Gates, who was hired by WMG and joined the Cobb neurosurgery staff in the fall of 2019, is African-American. (JA-351, Adewumi I 511; JA-1606, Hunt ¶ 21; JA-923, Benedict 64-65.) The next physician hired by WMG to join the Cobb neurosurgery staff, Dr. Saint-Aaron Morris, who started at Cobb in 2022, likewise is African-American. (JA-351, Adewumi I 510-511; JA-1606, Hunt ¶ 22.)

neurosurgery transfers from Cobb to Kennestone, it was a goal when Dr. Benedict joined WMG, and a "clear need," to establish a neurosurgery service line at Cobb. (JA-915, Benedict 31; *accord id.* JA-917-18, Benedict 41-42.)

To establish this new neurosurgery position at Cobb, Dr. Benedict looked for candidates already having practice experience. (JA-916, Benedict 37.) In 2017, Appellant became the primary candidate for the unfilled neurosurgery opportunity at Cobb when, after having spent about four years in private practice in Houston, he reached out to his former colleague, Dr. Franklin Lin, to convey that he wanted to move back to Atlanta. (JA-916, 918, 923, Benedict 35, 43-44, 62; JA-358-59, Adewumi I 24-27.) Dr. Benedict, as WMG neurosurgery practice lead, played a central role in recruiting Appellant for the neurosurgery position at Cobb. (JA-916-17, Benedict 35-39; JA-359, Adewumi I 26-27.)

Dr. Muster and Dr. Benedict both had positive impressions of Appellant after their interviews and supported hiring him for the position. (JA-919, 923, Benedict 49, 62-63; JA-1261, Muster 40.) Specifically, Dr. Benedict recommended hiring Appellant and Dr. Muster approved the decision. (JA-1260, Muster 35-37; JA-923, Benedict 62.) Dr. Muster had the final decision regarding Appellant's hiring, but he rarely overruled the initial decision of the relevant practice group members. (JA-1260, Muster, 35-37; JA-923, Benedict 62.)

Appellant accepted the offer and was scheduled to begin his WMG employment at Cobb on March 19, 2018. (JA-381, Adewumi I 116; JA-922, Benedict 61.) After the offer of employment was made, he was presented with a Physician Services Agreement ("PSA" or "Agreement"), which he signed on November 21, 2017. (JA-361, 574, Adewumi I 35 & Ex. 1.) Appellant understood that the responsibilities of the position for which he was hired would be "[t]o serve as the neurosurgeon who would restart the service line as Cobb Hospital had not had a neurosurgeon for almost 20 years." (JA-359, Adewumi I 28.)

### 5. Cobb's Application of Its Peer Review Process to Adewumi

On March 1, 2018, Cobb granted Appellant medical staff privileges to practice as a neurosurgeon. (JA-725, 867, 892, Adewumi II 475 & Exs. 62, 66.) During the period from November 2018 to January 2019, eleven of Appellant's cases came up for peer review.[4] (JA-933-35, 943, 961, 964-65, 967, 1047, 1049-1056, Benedict 105-106, 112-13, 143, 217, 226-27, 232-33, 239-41 & Exs. 5, 7-10; JA-1467, Adewumi I, Exs. 9-10; JA-1631-33, Sayeed ¶¶ 34, 37, 41.) These peer review cases were sent to Dr. Benedict for an initial review, because there were no other neurosurgeons at Cobb to assist in the peer review process. (JA-934, Benedict 106.) Dr. Benedict did not ask to perform the review and had no information about

---

[4] Regardless of whether Adewumi "passed" his initial probationary period (*see* AOB at 11), all hospital medical staff are subject to the hospital's ongoing peer review process. (*See* JA-1471-72, Soundararajan ¶¶ 11-16.)

how the peer review cases that were presented to him had been generated. (*Id.* at 106, 227.)

In three cases reviewed around this time, two by Dr. Benedict and one by Dr. Sayeed, the care given by Appellant was found to be "Appropriate" with "No Recommendations Warranted." (JA-1627-28, 1632, 1637-40, 1793-94, 1796-99, Sayeed ¶¶ 13, 16-17, 37-38 & Exs. 1, 10, 11.) Another one of Appellant's cases was jointly reviewed by Dr. Soundararajan, then Cobb's Medical Staff President, and Dr. Benedict, who recommended issuing a LOI to Appellant and forwarding that case to Cobb's Multidisciplinary MCE Committee. (JA-1628, 1633, 1801-25, Sayeed ¶¶ 18, 43 & Ex. 12; JA-968, Benedict 243-45.) The Multidisciplinary MCE Committee reviewed this case and determined at its January 14, 2019, meeting that the standard of care provided was Appropriate. (JA-1627, 1633, 1801-25, Sayeed ¶¶ 8, 44 & Ex. 12; JA-968, Benedict 243-46.)

Eight of Appellant's other cases were reviewed by Dr. Benedict and/or Dr. Sayeed in late 2018/early 2019 and placed on the agenda for the March 1, 2019, meeting of the Cobb Surgery MCE Committee. (JA-1627-28, 1630, 1641-1791, 2028-35, Sayeed ¶¶ 8-15, 28 & Exs. 2-9, 22.) At this meeting (which Dr. Benedict attended as a non-voting member), the Surgery MCE Committee concluded that the care provided by Appellant was "Inappropriate" in four cases, and "Appropriate with Opportunity for Improvement" in the other four. (JA-1630, 2029-35, Sayeed ¶ 28 &

Ex. 22.) The Cobb Surgery MCE Committee recommended placing Appellant on a sixty-day focused review starting March 1, 2019. (JA-1630, 1632-33, 2034, Sayeed ¶¶ 28, 41 & Ex. 22.)

### 6. The March 2019 Mortality Case

On March 21, 2019, one of Appellant's surgical patients died after a surgery (craniotomy) he had performed. (JA-1628, 1634, 1827-53, Sayeed ¶¶ 19, 49 & Ex. 13.) Dr. Sayeed conducted the initial review of Appellant's care in the case and recommended sending an LOI to Appellant and that the case be forwarded to the Cobb MEC. (*Id.* Sayeed ¶ 49 & Ex. 13; *see* JA-1124, 1134-35, Hughes 48-49, 89-90.) Under the direction of Dr. Soundararajan, the Cobb MEC formed an ad hoc committee to review Appellant's peer review status. (JA-1122-24; JA-1471, Soundararajan ¶ 10.) The ad hoc committee met on several occasions and interviewed Appellant about the cases in which his care provided had been deemed "Inappropriate" by the Cobb peer review committee. (JA-1473, Soudararajan ¶¶ 21-25.) Following the ad hoc peer review committee's investigation, the Cobb MEC voted on May 21, 2019, to request "external review" of a total of five of Appellant's cases: the craniotomy mortality and four of Adewumi's cases in which an "Inappropriate" standard of care determination had been assigned by the Cobb Surgery MCE Committee. (JA-1630, 1827-53, 2041-51, Sayeed ¶ 30 & Ex. 13, 24;

JA-1183, Kuhlman 22-24; JA-1122-23, Hughes 41-42; *see* JA-932, Benedict 99-100.)

The results of the external physician's review of four "Inappropriate" cases are set forth in a letter dated June 20, 2019. (JA-1125, 1157, Hughes 51 & P's Ex. 72; JA-1300, Muster 195; JA-1634-35, 2057-74, Sayeed ¶¶ 51-52 & Ex. 27.) The "Overall Conclusion" section of the external reviewer's report concludes that in three of the four cases deemed "Inappropriate" by the Cobb Surgery MCE Committee, "the patients could have most likely been treated with isolated posterior decompressions and fusions . . . . Although an anterior approach is technically not wrong, a less aggressive approach on elderly patients may prove to be beneficial with lower morbidity." (JA-1635, 2057-74, Sayeed ¶ 52 & Ex. 27.) The external reviewer in the fatality case concluded: "[T]he patient would have likely been best managed by initially performing a decompressive hemicraniectomy without attempted removal of the frontal contusion and also from a more immediate placement of an EVD [exterior ventricular drainage] when the hydrocephalus was detected." (JA-1635, 2076-79, Sayeed ¶ 53 & Ex. 28.)

7.    Continued Peer Review Concerns

From early April 2019 to July 17, 2019, six more of Appellant's cases were reviewed under the peer review process. (JA-1629-30, 1855-993, 2003-09, Sayeed ¶¶ 20-24, 26 & Exs. 14-18, 20.) During this time, except for a surgery performed at

Kennestone where Dr. Benedict worked as the WMG neurosurgery practice lead, Dr. Benedict did not serve as a sole initial screener for any of Appellant's peer review matters.[5]  (JA-932, Benedict 101.)

In four of those six cases, LOIs were recommended.[6] (JA-1629-30, 1854-1915, 1931-93, 2003-09, Sayeed ¶¶ 20, 21, 24, 26 & Exs. 14, 15, 18, 20.) In one of those six LOI cases, the Cobb Surgery MCE Committee ultimately determined that the care provided by Appellant was "Appropriate with Opportunity for Improvement," and in another, the Kennestone Surgery MCE Committee determined that the care provided was "Inappropriate." (JA-1629-30, 1931-93, 2003-09, Sayeed ¶¶ 24 & 26 & Exs. 18 & 20.) The "Inappropriate" care determination involved a head injury trauma patient for whom Appellant provided care at Kennestone and

---

[5] On April 4, 2019, Dr. Muster had emailed Dr. Benedict and told him that Appellant "feels [Benedict] may have already determined that he is not going to succeed or are biased against him." (JA-980, 1092-93, Benedict 290 & P's Ex. 28.) There is no record evidence that Appellant ascribed unlawful race discrimination as the basis for this alleged "bias" when he spoke with Dr. Muster. (JA-2431.) Moreover, while Appellant seemingly attempts to link his April 2019 alleged expression of concern about "bias" to later events (*see* AOB at 15-17, 23, 29, 38), there is no retaliation claim in this case, as the Magistrate Judge noted in recommending summary judgment. (JA-2362.)

[6] Regarding another surgery by Appellant for which a LOI was recommended during this period, the care provided was deemed to be "Appropriate" by the Cobb Surgery MCE Committee with a notation that "[n]othing [was] technically done wrong" and it was "[u]nclear why this surgeon has a high infection rate." (JA-1629, 1922, Sayeed ¶ 23 and Ex. 17.)

13 of 56

who died following neurosurgery. (JA-1630, 2003-09, Sayeed ¶ 26 & Ex. 20 [Bates 000102-000108].)

In sum, twenty of Appellant's cases triggered peer review in less than sixteen months of surgical procedures (between March 2018 and June 2019), including, ultimately, six determinations of "Inappropriate" care and five findings of "Appropriate with Opportunity for Improvement." (JA-331, ¶ 95.)

8.    Cobb's Decision to Place Appellant on an Action Plan

In July 2019, after receiving and reviewing the external reviewers' reports, the Cobb MEC placed Appellant on a formal Action Plan in accordance with Cobb's Medical Staff Bylaws. (JA-1115-16, 1124-26, 1128, Hughes 13-14, 48-50, 55, 63; JA-1186-87, Kuhlman 37-38; JA-986, Benedict 316; JA-1104-06, P's Ex. 36; *see also* JA-1630-31, 2051, Sayeed ¶ 31 & Ex. 25.) The MEC's decision to place Appellant on an Action Plan was made independent of and without any input from either Dr. Benedict or Dr. Muster.[7] (JA-1126, 1131, Hughes 56, 73-74; JA-1305, Muster 214.) The Plan "strongly recommend[ed] that [Appellant] arrange for an extensive mentorship with [his] group practice, WellStar Medical Group ("WMG"), and its neurosurgeons who practice primarily at [Kennestone]" during which he "should spend 100% of [his] time working with other WMG neurosurgeons at Kennestone" for the purpose of "immers[ing] [himself] in collaborative care,

---

[7] As Dr. Hughes explained, "[Dr. Benedict] would have had no involvement. He was not a member of the hospital medical executive committee." (JA-1126, Hughes 56.)

learning, and camaraderie with the other WMG neurosurgeons through participation in case conferences and Kennestone Medical Care Evaluation (MCE) Committee activities." (JA-402, 636, Adewumi I 199-200 & Ex. 32.) It also "strongly recommend[ed] and encourage[d] [Appellant] to discuss all of [his] cases, particularly complex cases, and review operative plans with other WMG neurosurgeons prior to surgery." (*Id.*) The Action Plan required Appellant to spend 4.5 months at Kennestone under the supervised mentorship of his neurosurgery practice colleagues. (*Id.*) The Action Plan also called for a 12-month Focused Review of 100% of all of Appellant's cases performed at Cobb after his contemplated return there. (*Id.*)

9.    The Need for "Buy-In" by the Kennestone Neurosurgery Group

Because the Action Plan developed by the Cobb MEC required the involvement and support of other WMG neurosurgeons, it was shared with Dr. Muster, who also discussed the Action Plan with the practice line leader, Dr. Benedict. (JA-1269, Muster 71; *accord id.* JA-1303, Muster 209; *see also* JA-1378, P's Ex. 54; JA-1194, Kuhlman 68; JA-984, Benedict 306-08.) The Action Plan required Appellant to take call at Kennestone using a "buddy system" with another Kennestone neurosurgeon, and any surgeries he completed would be done in partnership with one of the other neurosurgeons. (JA-946, Benedict 155-56.) The intent of this part of the Action Plan was to teach Appellant how the Kennestone

neurosurgery team performed, so that he could bring those lessons back to his work at Cobb. (*Id.*)

Dr. Benedict's July 3, 2019, confidential email to his Kennestone colleagues (Drs. Khaldi, Lin, Humphries, Parry, and Hsu) explained, "Since this will affect all of us, I would like for the Kennestone based surgeons to meet with Dr. Adewumi after he is presented with the action plan that Cobb MEC is planning to initiate next week. … [I]t will more than likely outline a plan that will include [Appellant] having to perform 75% of his work at [Kennestone] under the supervision of the partners here." (JA-983, Benedict 304-05; JA-1099, P's Ex. 33; *accord* JA-1304, Muster 211.) The Kennestone neurosurgery group, along with Dr. Muster, met with Appellant on July 9, 2019, during which it was agreed that rather than split his time 75% at Kennestone and 25% at Cobb for six months in order to complete the supervised "immersion" part of the Action Plan, Adewumi would work 4.5 months (75% of 6 months) entirely at Kennestone before returning to Cobb. (JA-1305, Muster 214-15 & JA-1104-06, P's Ex. 36.)

Appellant signed the Action Plan prepared by the Cobb MEC on July 17, 2019, completion of which was necessary for his continued Medical Staff Membership and clinical privileges at Cobb. (JA-373, 398, 402, 636, Adewumi I 185, 199-200 & Ex. 32; JA-1304, Muster 212; JA-1104-06, P's Ex. 36.)

10.    <u>Appellant's Performance Under the Action Plan</u>

Under the terms of the Action Plan, Appellant was asked to meet with Cobb's Medical Staff President (Dr. Chad Kuhlman) and Interim Vice President of Medical Affairs (then, Dr. Hughes) at the end of July, September, and November 2019. (JA-1128-29, 1131, 1150, Hughes 64-67, 74-75 & JA-1104-06, P's Ex. 36.) Those meetings occurred in late July and on or about September 25, 2019. (*Id.*)[8]

During the ten weeks that Appellant was on the Action Plan at Kennestone, Dr. Benedict did not work directly with him in order to ensure objectivity and give him the opportunity to work with other Kennestone surgeons who have other approaches. (JA-947, Benedict 158-59.) Dr. Benedict received feedback about working with Appellant orally from his colleagues. (*Id.*)  Appellant's colleagues voiced concerns to Dr. Benedict that, despite the strain that the Action Plan was placing on them, Appellant was not internalizing the learning that the Action Plan was intended to instill and that they appeared to be more invested in his professional development than he was. (JA-1450-51, Declaration of Dr. Edward Hsu ¶¶ 5-8; JA-1455-57, Declaration of Dr. Phillip Parry ¶¶ 9-13; JA-1464-65, Declaration of Dr. Franklin Lin ¶¶ 7-10.)

---

[8] Neither Dr. Hughes nor Dr. Kuhlman spoke with any member of the neurosurgery team at Kennestone about Appellant's performance in advance of these meetings. (JA-1129, Hughes 69; JA-1194, Kuhlman 69.)

In approximately September 2019, Dr. Muster discussed with Dr. Benedict how Appellant was performing under the Action Plan, including "his attitude and his interaction with his colleagues, and whether it appeared that he could manage the – the acuity of the patients that we treat." (JA-951, Benedict 176-77.) Dr. Benedict told Dr. Muster that Appellant "was taking his call as per the action plan, he was engaged in studying, … but . . . the maturity of his diagnostic skill set wasn't evolving, and he was resentful of the position that he was put in. He was going through the motions to satisfy the action plan." (JA-951-52, Benedict 177-78.) The aspects of the Action Plan on which Appellant was "going through the motions" included "[s]eeing patients in consultation, discussing those cases with colleagues, rounding, writing notes. More the documentation portion of the process of being a physician." (JA-953, Benedict 184.) In Dr. Benedict's assessment, "[Appellant] put efforts into the tasks that he felt were appropriate to him rather than the entire job, which is patient care." (*Id.* at 185.) Dr. Benedict also expressed concerned for the potential problems Appellant's shortcomings could create when he returned to Cobb, particularly because a new neurosurgeon, Dr. Gates, who was hired straight out of residency, was set to start working at Cobb later that same year. (JA-952, 983, Benedict 178, 302.) Dr. Benedict conveyed to Dr. Muster his concern that the strain on the neurosurgery team was too great and causing disruption and that the

neurosurgeon team was more invested in Appellant's development than he was. (JA-1268, Muster 69.)

Although Appellant suggests repeatedly that none of his other Kennestone neurosurgery colleagues expressed concern about his work there under the Action Plan (*see, e.g.,* AOB at 21, 33, 34, 42, 48, 50, 53), for the period from June 2019 – December 2019, Appellant's neurosurgery colleague Dr. Lin completed a reference form for Appellant's application for recredentialing at Cobb in which he indicated that he had "some concern" about: (i) Appellant's "technical and clinical skills"; (ii) whether his clinical judgment is "compassionate, appropriate and effective"; (iii) his interpersonal skills (reporting "Known difficult interactions with some staff at Cobb – ICU teams"); (iv) his "responsiveness to patient and family needs" (although noting improvement); and, in sum, recommended Appellant for recredentialing "with reservation," noting that Appellant's "cases should be scrutinized and reviewed given his past history" and that he should have "good backup coverage and colleagues to discuss cases with." (JA-727-28, 895-97, Adewumi II 483-88 & Ex. 68.) Similarly, Appellant's colleague Dr. Ahmad Khaldi completed a recommendation form for Appellant's Cobb recredentialing application that spanned the Action Plan period, in which he recommended recredentialing "with reservation" and noted, "Due to his previous limitation at Cobb hospital, I would continue to

review his cases for a period of time." (*Id.* JA-727, 898-99, Adewumi II 488-89 & Ex. 69.)

In light of what Dr. Muster knew about the additional burden and stress Appellant's presence at Kennestone was placing on his neurosurgery colleagues there, Dr. Muster became concerned that one or more of them might decide to leave WMG and practice elsewhere. (JA-1315, Muster 254-55.)

### 11.    Termination of Adewumi's WMG Employment

The decision to terminate Appellant's employment was made by Dr. Muster, Senior Vice President, WMG Specialty Division, and not by Cobb. (JA-1272, 1306-07, Muster 82, 85, 221, 224-25.) A hospital MEC that places a physician on an action plan does not have authority to terminate the employment of that physician. (JA-1188, Kuhlman 42; *see also* JA-1195, Kuhlman 70 ("Wellstar Medical Group has nothing to do with Cobb MEC. That's like Coke and Pepsi. … [If] I'm in Coke, I can't tell Pepsi what do to….") Dr. Muster does not recall Dr. Benedict ever raising the prospect of terminating Appellant's WMG employment. (JA-1268, Muster 69.)

Dr. Muster met with Appellant in his (Dr. Muster's) office on October 8, 2019, to advise him of the termination of his WMG employment. (JA-1270, Muster 76-77; JA-412, Adewumi I 238.) At the termination meeting, as Appellant admits (AOB at 20, 39-40), Dr. Muster told Appellant that his termination was because implementation of the Action Plan at Kennestone was putting significant strain on

the neurosurgery group there. (JA-417, Adewumi I 260.) Dr. Muster's termination decision was not based on any non-compliance by Appellant with the Cobb MEC's Action Plan, and Dr. Muster so told Appellant at the October 8, 2019, termination meeting. (JA-1307, Muster, 224; JA-1389-92, P's Ex. 61; *see also* AOB at 20.) Likewise, no one told Appellant that his termination was based on the LOIs he had received from the Cobb MCE Committees. (JA-417, Adewumi I 259; JA-1389-92, P's Ex. 61.)

Dr. Muster further advised Appellant at the October 8, 2019, meeting that, pursuant to the terms of his PSA, he had decided that the termination would be a "no-cause" termination. (JA-1271, Muster 80.) Dr. Muster advised Appellant that, by terminating his employment pursuant to the "no cause" provisions of his PSA, WMG could, and did, elect to relieve Appellant of any work duties during the contractual 180-day notice period, but that he would continue to be employed during that period (i.e., paid until April 5, 2020). (JA-1271-72, 1308, Muster 80-82, 226; JA-1388, P's Ex. 60; JA-413, 641-42, Adewumi I 244 & Ex. 36.) The "no-cause" termination also relieved Appellant from the non-compete provisions of the PSA that otherwise would apply. (JA-573-91, Adewumi I, Ex. 1 [Bates 001104]; JA-1308, Muster 226; JA-1388, P's Ex. 60.)

Joey Hunt, Human Resources Vice President for WMG, also attended the October 8, 2019, meeting with Appellant. (JA-1605, Hunt ¶ 19; JA-412, Adewumi I

238; *see* JA-1270-71, 1308, Muster 77, 80-81, 226; JA-1388, P's Ex. 60.) Appellant did not raise any complaint of race, color, or national origin discrimination with Hunt during the October 8, 2019, termination meeting or during the 180-day notice period. (JA-1601, Hunt ¶ 7.)

After communicating the termination decision to Appellant, Dr. Muster sent an email to Dr. Chad Kuhlman, who was then Cobb's Medical Staff President, letting him know of his (Dr. Muster's) decision to terminate Appellant's WMG employment. (JA-1307, Muster 222-23; JA-1387, P's Ex. 59; JA-1189-90, Kuhlman 47-50.)

      12.   Evidence Regarding Alleged Comparators

Appellant's only identified comparator is Dr. Phillip Parry, a white WMG neurosurgeon who worked at Kennestone. (JA-735-36, Adewumi II 515-16; Doc. 30 at 50-51; *see* AOB at 31.) Appellant alleges that Dr. Parry was responsible for an unnecessary surgery, but that this incident did not result in initiation of the peer review process at Kennestone (where Dr. Parry practices).  (JA-399, Adewumi I 151-53; Doc. 30 at 50-51.) Appellant could have, but never did, initiate peer review of the alleged inappropriate care provided by Dr. Parry. (JA-406, Adewumi I 214-15.) There is no peer review information regarding Dr. Parry in the record. *See infra* part II.A.

## SUMMARY OF THE ARGUMENT

The District Court correctly applied settled Eleventh Circuit law to the evidence of record and granted summary judgment on Appellant's § 1981 claim. Adopting the Magistrate Judge's R&R, the District Court first correctly concluded that, as a matter of law, Appellant cannot meet his burden of proving a *prima facie* case of intentional race discrimination. (JA-2445.) He presented no evidence of any non-African-American similarly situated physician who was treated differently under like circumstances or any other evidence of unequal treatment based on his race sufficient to raise even an initial inference of intentional race discrimination.

Regardless of Appellant's inability to carry his burden of proving a *prima facie* case, the District Court correctly found no triable evidence that the legitimate, nondiscriminatory reason for the termination of Appellant's WMG employment was a pretext, or a cover-up, for intentional race discrimination. (JA-2445-47.) Based on its analysis of the same evidence, the District Court correctly found that Appellant could not withstand summary judgment under the "convincing mosaic" approach.

In short, there is no triable evidence that "but for" Appellant's race, his employment contract would not have been terminated. On appeal, Appellant identifies no error in the District Court's order of dismissal, and this Court should affirm.

## <u>STANDARDS OF REVIEW</u>

<u>On the Grant of Summary Judgment</u>: This Court reviews a district court's grant of summary judgment de novo. *Poer v. Jefferson Cnty. Comm'n,* 100 F.4th 1325, 1335-36 (11th Cir. 2024). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)). A fact is "material" if it could "affect the outcome of the suit under the governing law." *Furcron v. Mail Ctrs. Plus, LLC,* 843 F.3d 1295, 1303 (11th Cir. 2016) (internal quotation marks omitted).

"[T]he moving party has the burden of demonstrating that there are no genuine issues of material fact." *Paylor v. Hartford Fire Ins.,* 748 F.3d 1117, 1121 (11th Cir. 2014). "Once a summary judgment movant's initial burden is met, 'the burden shifts to the nonmoving party to bring the court's attention to evidence demonstrating a genuine issue for trial.'" *Poer*, 100 F.4th at 1336 (citing *Paylor,* 748 F.3d at 1121). "The non-movant must . . . provide evidence and 'designate specific facts showing that there is a genuine issue for trial.'" *Poer,* 100 F.4th at 1336 (citing *Celotex Corp v. Catrett,* 477 U.S. 317, 324 (1986)).

<u>On Application of Local Rules of Court</u>:  A district court's application of its local summary judgment rules is reviewable only for abuse of discretion. *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1302 (11th Cir. 2009) ("We give 'great deference to

a district court's interpretation of its local rules'") (citation omitted). "[T]o meet the abuse of discretion standard, [a party] bear[s] the burden of showing that the district court made a clear error of judgment." *Mann,* 588 F.3d at 1302 (citation omitted); *accord Williams v. Slack,* 438 F. App'x 848, 849 (11th Cir. 2011) (upholding district court's application of N.D. Ga. L.R. 56.1).

## LEGAL STANDARDS APPLICABLE TO § 1981 CLAIMS

Section 1981 prohibits intentional discrimination on the basis of race in the making and enforcing of contracts, including employment contracts. 42 U.S.C. § 1981(a), (b); *accord Webster v. Fulton Cnty.,* 283 F.3d 1254, 1256 (11th Cir. 2002). To prevail on § 1981 claims, a plaintiff bears the ultimate burden of proving that a discriminatory motive was the "but for" cause of the alleged actionable adverse employment action. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 140 S. Ct. 1009, 1019 (2020).[9] When the "but for" causation standard applies, a plaintiff's claim "cannot succeed unless the employee's protected trait *actually played a role* in [the employer's decision-making] process *and had a determinative influence on the outcome*." *Sims v. MVM, Inc.,* 704 F.3d 1327, 1332 (11th Cir. 2013) (emphasis

---

[9] Under the *Comcast* "but for" standard, there is no "mixed motive" theory available under § 1981. *E.g., Robinson v. Habersham Cnty.,* No. 2:20-CV-108-SCJ-JCF, 2022 WL 22640356, at *19 (N.D. Ga. July 26, 2022), *report and recommendation adopted sub nom. Robinson v. Sutton,* No. 2:20-CV-00108-SCJ, 2022 WL 22638522 (N.D. Ga. Sept. 23, 2022). The pre-*Comcast,* out-of-Circuit decisions referencing mixed motive analysis cited by Appellant (AOB at 50) are therefore inapposite.

added) (citing *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 176 (2009) (ADEA claim)).

A § 1981 plaintiff may use direct or circumstantial evidence to prove his race discrimination claim. *Tynes v. Fla. Dep't of Juv. Just.,* 88 F.4th 939, 944 (11th Cir. 2023). Here, Appellant presents no direct evidence of race discrimination.[10]

Under this Court's precedent,[11] circumstantial evidence presented in opposition to summary judgment may be analyzed under two distinct – but overlapping – proof paradigms to determine whether there is a triable issue of fact. Under the familiar *McDonnell Douglas* framework, a plaintiff asserting a § 1981 race discrimination claim must show that: (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse employment action; and (4) his employer treated similarly-situated employees outside his class more favorably. *Poer,* 100 F.4th at 1336 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)); *accord Lewis v. City of Union City,* 918 F.3d 1213, 1220-21 (11th Cir. 2019) (en banc) ("*Lewis I*").

---

[10] "Direct evidence is 'evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption.'" *Jefferson v. Sewon Am., Inc.,* 891 F.3d 911, 921 (11th Cir. 2018) (citation omitted). "Only the most blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Holland v. Gee,* 677 F.3d 1047, 1055 (11th Cir. 2012) (quotation marks omitted).

[11] Appellant relies largely on Second Circuit authority. (*See, e.g.,* AOB at 28, 35, 50, 51.)

If, and only if, the plaintiff establishes a *prima facie* case, the burden shifts to the employer to *articulate* a legitimate, non-discriminatory reasons for its actions. *Poer,* 100 F.4th at 1336 (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)); *accord Lewis I*, 918 F.3d at 1221. If an employer meets its burden of articulating a non-discriminatory reason for the adverse action, "'to avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.'" *Poer,* 100 F.4th at 1336 (citation omitted). "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, and that discrimination was the real reason.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (emphasis in *Hicks*).

The *McDonnell Douglas* framework, while commonly applied, is not the only framework to establish a triable inference of discrimination through circumstantial evidence. *Tynes,* 88 F.4th at 946. A plaintiff may be able to present "a convincing mosaic of circumstantial evidence that would allow a reasonable jury to infer intentional discrimination by the decisionmaker." *See Tynes*, 88 F.4th at 946; *accord Ossmann v. Meredith Corp.,* 82 F.4th 1007, 1020 (11th Cir. 2023). However, such evidence must be sufficient to "allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011) (citation omitted).

**ARGUMENT**

The undisputed material facts demonstrate that under either the *McDonnell Douglas* or "convincing mosaic" paradigm, the District Court correctly granted Appellees' summary judgment motion. Because Appellant misstates the record, however, Appellees pause briefly to address the record before analyzing the evidence under applicable legal standards.

## I.   APPELLANT'S STATEMENT OF FACTS VIOLATES THIS COURT'S AND THE DISTRICT COURT'S RULES.

Appellant's treatment of the record before the District Court and this Court should be disregarded for two reasons. First, his Statement of Facts fails to comply with *this* Court's rules regarding presentation of matter in the record. Second, Appellant relies heavily on purported evidence that was properly rejected by the District Court because it was presented in violation of *that* Court's local rules.

### A.   Appellant's Statement of Facts Violates This Court's Rules.

Rule 28-1(*i*) of this Court requires that "[i]n the statement of the case, *as in all other sections of the brief,* every assertion regarding matter in the record should be supported by a reference to the record …." (emphasis supplied.) Appellant's Statement of Facts (AOB at 10-24), as well as other parts of his brief containing factual assertions (*e.g.,* AOB at 30-37), often provide no record cites for factual assertions and thus fail to comply with Rule 28-1 of this Court. Furthermore, the

AOB frequently cites to pages in the Joint Appendix that have not been filed with the Court or provided to Appellees' counsel.

As this Court aptly observed, "appellate judges 'are not like pigs, hunting for truffles buried in briefs.'" *United States v. Al Jaberi,* 97 F.4th 1310, 1323 n. 3 (11th Cir. 2024) (internal citations omitted) (rejecting argument unsupported by a statement of facts required under 11th Cir. R. 28-1(i)(ii)). Appellant's Statement of Facts, and any arguments presented without reference to supporting record cites, should be disregarded.

Of note, Appellant's Statement of Facts predominantly focuses on defending his professional reputation as a neurosurgeon against the LOIs he received, the external review of some of his cases, and Cobb's peer review process generally. (*See, e.g.,* AOB at 18, 22-24; *see also id.* at 30-31, 38.) None of those actions *by Cobb Hospital* was the reason for his termination *by WMG.* No matter how unhappy Appellant was with Cobb's peer review process, litigation such as this is not an opportunity "to allow [Section 1981] plaintiffs simply to litigate whether they are, in fact, good employees." *Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir. 2002).

In short, Appellant's Statement of Facts is immaterial in substantial part and noncompliant with this Court's rules. It should be disregarded in deciding this appeal.

B.  The District Court Properly Disregarded Appellant's
Evidence Submitted in Violation of Its Local Rules, and
Appellant Has Forfeited Any Argument to the Contrary.

Under the Local Rules of the Northern District of Georgia, a party responding to a summary judgment motion may present new facts only *through an additional statement of material facts,* to which the moving party is given an opportunity to respond to facilitate the orderly consideration of relevant evidence. N.D. Ga. L.R. 56.1(B)(2)(b) (emphasis supplied). A party cannot avoid summary judgment by citing allegedly disputed facts without enumerating them in the required separate statement. *E.g., Lewis v. Residential Mortg. Sols.,* 2018 WL 5276221, at *2 (N.D. Ga. Aug. 31, 2018), *report and recommendation adopted,* 2018 WL 5276190 (N.D. Ga. Oct. 16, 2018), *aff'd,* 800 F. App'x 830 (11th Cir. 2020) ("The Court … cannot consider any fact set forth only in a brief and not in a response to the movant's statement of facts or in the respondent's own statement of additional material facts.") (citation omitted).[12]

Instead of following these rules,[13] Appellant filed no separate statement of facts in opposition to Appellees' summary judgment motion and attempted to

---

[12] *See also, e.g., Lamar v. Lahood,* 2012 WL 12884917, at *2, n.2 (N.D. Ga. Oct. 10, 2012) ("[T]he Court cannot consider facts set out only in a [response] brief and not in a respondent's statement of additional material facts.").

[13] On more than one occasion, Appellant's counsel filed documents – including Appellant's response in opposition to summary judgment (JA-2149) – without benefit of local counsel, in further violation of the Northern District's Rules. N.D. Ga. L.R. 83.1(B)(4)

interject (after two deposition sessions) substantial allegations through his purported declaration (on which he likewise heavily relies here, as noted above). Based on its Local Rules, the District Court declined to consider such evidence. (JA-2443.)

This Court has agreed that failure to comply with local summary judgment rules has consequences, and has found no abuse of discretion in the District Court's application of them. As this Court explained in *Reese v. Herbert,* 527 F.3d 1253, 1268 (11th Cir. 2008):

> The proper course in applying Local Rule 56.1 at the summary judgment stage is for a district court to disregard or ignore evidence relied on by the respondent—but not cited in its response to the movant's statement of undisputed facts—that yields facts contrary to those listed in the movant's statement. That is, because the non-moving party has failed to comply with Local Rule 56.1—the only permissible way for it to establish a genuine issue of material fact at that stage—the court has before it the functional analog of an unopposed motion for summary judgment.

*Accord Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1303 (11th Cir. 2009) ("Despite their assertions, Plaintiffs' failure to comply with local rule 56.1 is not a mere technicality. The rule is designed to help the court identify and organize the issues in the case.") This Court therefore should affirm the District Court's decision to disregard purported evidence submitted in violation of its Local Rules.

In any event, Appellant has forfeited any objection to the District Court's application of its Local Rules by failing to raise any argument with respect to this issue in his Opening Brief. *United States v. Campbell,* 26 F.4th 860, 873 (11th Cir.),

*cert. denied,* 143 S. Ct. 95 (2022) ("failure to raise an issue in an initial brief on direct appeal should be treated as a forfeiture of the issue").[14]

## II. APPELLANT DID NOT SHOW TRIABLE EVIDENCE OF INTENTIONAL DISCRIMINATION UNDER *MCDONNELL DOUGLAS*

Discrimination means exactly what it sounds like: "'*treating like cases differently*.'" *Lewis I,* 918 F.3d at 1222 (citation omitted). "The converse, of course, is also true: Treating *different* cases differently is not discriminatory, let alone intentionally so." *Id.* at 1222-23 (citation omitted). Evidence comparing how a plaintiff was treated relative to similarly situated persons outside his protected group therefore is crucial to raising a triable inference of unlawful discrimination. Here, there is no comparative evidence, and the District Court correctly concluded that no inference of discrimination arises under the *McDonnell Douglas* approach.

### A. Appellant Failed to Show a *Prima Facie* Case of Race Discrimination.

To prove a *prima facie* case of discrimination, Appellant must show: (1) that he belongs to a protected class; (2) that he was subjected to an actionable adverse

---

[14] On appeal, Appellant has raised, without citation of authority, only the contention that the District Court erred in excluding his and Dr. King's declarations for the separate, independent reason that they were not properly executed pursuant to 28 U.S.C. § 1746. (AOB at 42; *see* JA-2443.) That contention should be considered abandoned as well. *Singh v. United States,* 561 F.3d 1275, 1278 (11th Cir. 2009) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal."). While not necessary to the District Court's treatment of Appellant's declarations, refusing to consider them because they failed to comply with statutory verification requirements also was correct and should be affirmed. (*See* JA-2443.)

employment action by WMG; (3) WMG treated similarly situated people outside of his protected class more favorably; and (4) he was qualified to do the job in question. *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091 (11th Cir. 2004); *accord Hicks,* 509 U.S. at 506. Any person outside the protected group with whom a plaintiff compares himself must be "'similarly situated *in all material respects.*'" *Lewis I,* 918 F.3d at 1226 (emphasis supplied).

The *prima facie* requirement is not insignificant: because the plaintiff bears the burden of proof at all times, it determines whether a defendant is required to answer that claim *at all.* Accordingly, as this Court has held, the "similarly situated" comparative analysis belongs in the *prima facie* stage and not at the later pretext stage. "It is only by demonstrating that her employer has treated 'like' employees 'differently' — *i.e.*, through an assessment of comparators — that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful *discrimination. Lewis I*, 918 F.3d at 1223. Moving the comparative assessment out of the *prima facie* case "would effectively shift to the defendant the burden of *disproving* discrimination – which is precisely what the Supreme Court has forbidden." *Id.* at 1223 (citing *Burdine,* 450 U.S. at 253, 254-58).

Here, because Appellant failed to present triable evidence that WMG treated a similarly situated employee outside his protected class more favorably under similar circumstances, his *prima facie* case fails. (JA-2418-2447.) There is no record

evidence that Dr. Muster was (a) presented with a situation in which another physician working in one of the WMG specialty groups he supervised (let alone, the neurosurgery practice group) was causing strain and imposing additional burden on his colleagues because of the mentorship and supervision he required and (b) treated that situation differently from Appellant's.

Before the District Court, Appellant primarily argued that Dr. Phillip Parry, a WMG neurosurgeon at Kennestone, was an appropriate comparator. (JA-2144-45.) The Magistrate Judge appropriately rejected that comparison (and the District Court agreed), concluding that Appellant's purported comparison focused the *quality of the medical care* that Dr. Parry allegedly provided to a particular patient (a hospital peer review issue), and not on whether *Dr. Parry's colleagues were burdened by working with him to the point that the practice group head feared defections* (a WMG employment issue). (JA-2357-60; JA-2441-43 .)

Any continuing attempted comparison with Dr. Parry in this Court (*see* AOB at 31) provides no support for Appellant's *prima facie* case for multiple reasons.

*First,* Appellant has pointed to (and there is) no record evidence about Dr. Parry's peer review or employment experience from which to draw any alleged inference of discriminatory treatment. Bare allegations of unequal treatment are not a basis on which summary judgment may be denied. *Cotton v. Enmarket, Inc*., 809 F. App'x 723, 724–25 (11th Cir. 2020); *Kennedy v. Kelly Temp. Servs., Inc.*, 95 F.

Supp. 2d 1288, 1294 (M.D. Ala. 2000) ("hunches unsupported with significant probative evidence" are not sufficient to withstand summary judgment).

*Second,* as noted above, Appellant was not terminated because of the medical care he provided, which is an issue for each hospital's peer review process. He was terminated because of Dr. Muster's concern that the strain imposed on the neurosurgery team at Kennestone by Appellant's presence there under the Cobb Hospital-imposed Action Plan was adversely affecting the practice group. (JA-2358-59.) *See Lewis*, 918 F.3d at 1228 (comparator will ordinarily not be similarly situated in all material respects if they do not "share the plaintiff's employment or disciplinary history"); *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (court must evaluate whether plaintiff and alleged comparator "are involved in or accused of the same or similar conduct and are disciplined in different ways") (citation omitted).

*Third*, Dr. Parry worked at Kennestone, under a different peer review process than Appellant, who worked at Cobb. (JA-1453, Parry ¶ 2.)

*Fourth,* the relevant decisionmaker as to Appellant, Dr. Muster, had nothing to do with the peer review process applicable to Dr. Parry at Kennestone (JA-2439-42), making any comparison between Appellant's and Dr. Parry's experience both factually and legally irrelevant. *See, e.g., Hester v. Univ. of Alabama Birmingham*

*Hosp.,* 798 F. App'x 453, 457 (11th Cir. 2020) (rejecting comparator, in part due to different supervisors, who were also the decisionmakers).

On appeal, Appellant seemingly broadens the attempted comparators, alleging that "Appellant was treated less favorably than his Caucasian colleagues who populated Kennestone for WMG." (AOB at 29; *see also id.* at 11 (referring to "white colleagues"); 29 ("Caucasian colleagues"); 31 ("Caucasians within the WMG"); 39 ("white counterparts"), 43 ("white peers"); 46 ("white neurosurgeons" and "white peers").) A plaintiff cannot prove a *prima facie* case by vague references to unidentified white coworkers without specifically identifying them and showing how they are similarly situated and yet differently treated. "To satisfy this fourth [comparator] requirement, a party must first identify a *specific,* similarly situated employee …" *West v. City of Albany, Georgia,* 830 F. App'x 588, 595 (11th Cir. 2020) (emphasis supplied); *accord Hill v. Oil Dri Corp. of Ga.,* 198 F. App'x 852, 858 (11th Cir. 2006) (holding district court did not abuse its discretion by striking from the record "vague and conclusory statements" in affidavits referencing "white comparators").

Furthermore, as with Dr. Parry, this stab at presenting the required comparative evidence is presented without any record support. Indeed, the discussion of facts allegedly showing a *prima facie* case in Appellant's Brief (AOB at 29-32) is entirely devoid of record citations. This Court accordingly should

disregard it. *Al Jaberi,* 97 F.4th at 1323 n.3. Appellant's legal argument on his *prima facie* case consists only of (a) a generalized assertion that the *prima facie* case requirement is not "onerous"; and (b) a contention that, in some cases, a plaintiff may survive summary judgment without specific comparative evidence. (AOB at 43-46.) Appellant's problem is that he has no such evidence, as discussed more fully below with respect to Appellant's attempt to raise an inference of discrimination under the so-called "convincing mosaic" approach.

In sum, Adewumi has failed to produce triable evidence that WMG "discriminated" against him by treating a *specific* similarly situated employee outside the protected group differently. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *McQueen v. Alabama Dep't of Transp.,* 769 F. App'x 816, 822 (11th Cir. 2019). To overlook the required *prima facie* showing places on Appellees the burden of disproving Appellant's bare allegations of intentional race discrimination – the exact outcome against which this Court plainly cautioned in *Lewis I*.

B.    Appellant Failed to Show That the Articulated Legitimate, Nondiscriminatory Reason for the Termination of His Employment Contract Was a Pretext for Intentional Race Discrimination.

When (unlike Appellant) a plaintiff is able to meet his *prima facie* burden, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason

for its actions." *Taylor v. Teakdecking Sys., Inc.*, 571 F. App'x 767, 769 (11th Cir. 2014). This is a burden of production, not persuasion. *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012).

> 1.    *WMG Articulated a Legitimate Nondiscriminatory Reason for Terminating Appellant's Employment Contract.*

As the District Court correctly concluded, WMG met its burden of showing a legitimate, nondiscriminatory reason for Adewumi's termination: the strain and additional burden his presence at Kennestone under the Cobb Hospital-imposed Action Plan was placing on his WMG neurosurgery colleagues. (JA-2443-47; *see also* AOB at 20.[15]) This is a legitimate, nondiscriminatory reason for terminating Appellant's employment, regardless of whether he disagrees with it. "Employers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *McNeal v. Int'l Paper*, No. 21-12672, 2022 WL 5434274, at *4 (11th Cir. Oct. 7, 2022) (citation omitted); *accord Chapman v. AI Transp.*, 229

---

[15] Appellant's suggestion that Appellees formulated this reason to avoid factual issues about his medical practice (AOB at 34) is completely belied by the neurosurgeon declarations supporting the conclusion that Dr. Muster reached. (JA-1448-51, 1452-61, 1462-66 [Docs. 89-7, 89-8, 89-9].) These declarations also underscore the inexplicable illogic in Appellant's repeated suggestion that "there is "no evidence" to support the conclusion that the action plan burdened WMG members." (AOB at 34, 41-42, 56.) It goes without saying that this testimony *is* evidence supporting the reason for Appellant's termination.

F.3d 1012, 1030 (11th Cir. 2000) (en banc) ("federal courts do not sit as a super-personnel department that reexamines an entity's business decisions").

2.    *Appellant Offered No Evidence of Pretext.*

Once the employer articulates a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts to the plaintiff to "demonstrate[] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Albert-Aluya v. Burlington Coat Factory Warehouse Corp.,* 470 F. App'x 847, 851 (11th Cir. 2012) (citation omitted). A § 1981 plaintiff opposing summary judgment carries his burden of proving pretext only by showing "*both* that the reason was false, *and* that discrimination was the real reason." *Springer v. Convergys Customer Mgmt. Grp. Inc.,* 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original) (quoting *Brooks v. County Comm'n of Jefferson County,* 446 F.3d 1160, 1163 (11th Cir. 2006)).

"When – as in this case – the employer's 'proffered reason is one that might motivate a reasonable employer, an employee *must meet that reason head on and rebut it*, and the employee cannot succeed by simply quarreling with the wisdom of that reason.'" *Ward v. Troup Cnty. Sch. Dist.,* 856 F. App'x 225, 228-29 (11th Cir. 2021) (citation omitted) (emphasis supplied). To overcome this commonsense rule for evaluating claimed evidence of pretext, Appellant needed to offer evidence that

Dr. Muster did *not* believe that complying with Cobb's Action Plan was imposing unacceptable burden and stress on the Kennestone neurosurgeons. No such evidence is present here.

None of Appellant's assertions of pretext is sufficient to show both that Dr. Muster's stated reason was not the real reason *and* that Appellant's race was the real reason for the termination decision.[16] "[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext of intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its actions." *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs,* 47 F.3d 1068, 1073-74 (11th Cir. 1995) (citation omitted).

Only two of Appellant's conclusory pretext arguments merit specific response.

<u>*First,*</u> Appellant asserts his personal opinion that he was not burdening the Kennestone neurosurgeon group and, conversely, that there is "no evidence that [he] was a burden." (AOB at 34; *see also id.* at 42, 48-50, 56.) This assertion improperly suggests that the District Court, and this Court, should simply ignore the *entirely unrebutted declaration testimony* of his Kennestone colleagues about their

---

[16] Again, Appellant's discussion of the record purportedly showing pretext is devoid of a single record cite (other than an immaterial one about a joint employer question not before this Court). (AOB at 32-37). This Court should disregard Appellant's pretext discussion because of its disregard for 11th Cir. R. 28-1. *See supra* part I.A.

concerns.[17] However, in deciding summary judgment, courts are required to accept as true unrebutted evidence supporting a reasonable, nondiscriminatory basis for the adverse employment action. *E.g., Cheatwood v. City of Vestavia Hills,* No. 21-13680, 2022 WL 2921304, at *1 (11th Cir. July 26, 2022) ("summary judgment may be granted 'if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'") (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000)).

Moreover, Appellant's self-serving opinion that he "wasn't a burden" is just as irrelevant as would be an assertion by an employee fired for tardiness that he "was always on time," when timeclock records on which the employer relied show that he was not. As this Court explained in *Alvarez v. Royal Atl. Devs., Inc.,* 610 F.3d 1253, 1266-67 (11th Cir. 2010), "the fact that [the plaintiff] thinks more highly of her performance than her employer does is beside the point. The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."[18]

---

[17] *See* Hsu Decl. (JA-1451 [Doc. 89-7)] ¶¶ 5-7; Parry Decl. (JA-1455 [Doc. 89-8] ¶ 9; Lin Decl. (JA-1465 [Doc. 89-9] ¶¶ 9-10 (all filed under seal); *see also* JA-1277 [Doc. 89-6], Muster 102 (testifying regarding concerns that Dr. Parry relayed to him about Appellant's performance while at Kennestone).

[18] *Accord Rojas,* 285 F.3d at 1342 (explaining that the question to be resolved is not the wisdom or accuracy of the decision or whether it was "prudent or fair"; the

*Second,* citing Second Circuit precedent, Appellant invokes the "cat's paw" theory and argues that Dr. Benedict's "bias" allegedly infected Cobb's peer review process and thus, through a tenuous and entirely speculative route, WMG's (Dr. Muster's) termination decision. Appellant asserts that these unsupported assertions would allow a reasonable jury to infer that but-for Appellant's race, his contract would not have been terminated. (AOB at 32, 34-37.) This argument is baseless. As stated by this Court, the "cat's paw" theory requires, first, the presence of an "intentionally discriminating" non-decisionmaking employee. *Ziyadat v. Diamondrock Hosp. Co.,* 3 F.4th 1291, 1297 (11th Cir. 2021). Here, there is *no evidence* by which any reasonable jury could infer intent by Dr. Benedict to intentionally discriminate against Appellant because of his race. Even when a plaintiff can show that such an "intentionally discriminating" non-decision-making employee exists, the plaintiff must also "plausibly allege that the discriminating employee's racial animus (1) was intended to cause and (2) did cause the contractual

_____

court's "sole concern is whether unlawful discriminatory animus motivate[d]" the decision) (quotation marks and citation omitted); *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir. 1997) (plaintiff's speculation or subjective assertions about his own job performance do not establish pretext); *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

injury." *Id.* at 1297.[19] Again, there is *no evidence* supporting such a conclusion. Indeed, Appellant agrees that the results of the peer review process were not the basis for the termination decision and that he never lost privileges at Cobb because of his peer review experience. (AOB at 20, 22, 33.) The testimony of Appellant's Kennestone colleagues supporting the actual reason for the termination is entirely unrebutted.

Appellant's other asserted pretext arguments are equally unsupported and irrelevant and do not support a finding of pretext:

- AOB at 32-33: Appellant speculates about WMG's involvement in Cobb's peer review process and decision to place Appellant on an Action Plan, without record evidence supporting this speculation (other than the need for WMG neurosurgeons' "buy-in" on the Kennestone component of the plan). *See supra* Statement of Undisputed Material Facts, 9. Regardless, this allegation says nothing casting doubt on the articulated reason for Appellant's termination, and certainly does not support an inference that it was *because of* his race.

---

[19] *See also Duncan v. Alabama*, 734 F. App'x 637, 639 (11th Cir. 2018) (reasoning that under the "cat's paw" theory, the decision-maker must "rubber-stamp" the discriminating subordinate's recommendation). Appellant's argument that if Dr. Benedict advocated for his termination, then his (Dr. Benedict's) alleged "bias" necessarily must be imputed to Dr. Muster does not align with the law in the Eleventh Circuit, given the record evidence of the concerns relayed to Dr. Muster by the Kennestone neurosurgeons.

- AOB at 21, 33, 34, 42, 48-50, 53: Appellant argues that pretext should be inferred because the other neurosurgeons did not tell him his presence was burdening them *in advance of* his termination. This is without any probative value as to either the truth of the stated reason for his termination or whether the decision was *because of* Appellant's race.[20]

- AOB at 34-35, 48-50: Appellant points out that he was satisfactorily completing Cobb's Action Plan at the time of his termination. Again, this is irrelevant; it relates to the hospital's peer review of Appellant and not to WMG's concerns about his continued work as part of the neurosurgeon group. This argument allows no inference that Appellant's contract was terminated *because of* his race.

- AOB at 9, 25, 27-28. 36, 49-50: Appellant seeks to find support for his pretext arguments in the Supreme Court's ruling in *Reeves,* 530 U.S. 133, by suggesting that it stands for the proposition that if a jury could disregard evidence, then summary judgment must be denied. However, *Reeves* held that the court should give credence to "uncontradicted and unimpeached" evidence for the moving party. *Id.* at 151. In contrast, Appellant relies on hypothetical questions and conclusory allegations in response to Appellees' undisputed

---

[20] Of note, Appellant had every opportunity to depose his neurosurgeon colleagues regarding the concerns they had about his presence at Kennestone and what they relayed to Dr. Muster, but he chose not to do so.

evidence (*see* AOB at 34-35, 40-41), which "have no probative value at the summary judgment stage unless supported by specific facts." *Cooper v. Jefferson Cnty. Coroner & Med. Exam'r Off.,* 861 F. App'x 753, 755 (11th Cir. 2021).

### 3.    *The Record Suggests the Absence of Pretext.*

Rather than suggest pretext, the record evidence underscores the absence of unlawful discriminatory motive.

*First*, as the District Court correctly found (JA-2439-42), the fact that Dr. Muster was the decisionmaker for Appellant's hiring and termination in a short period of time "give[s] rise to a *permissible inference* that no discriminatory animus motivated [the employer's] action." *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998). Of note, Dr. Muster was also the decisionmaker in the hiring of two other African-American neurosurgeons, including both a neurosurgeon hired around the same time as Appellant who started at Cobb in the fall of 2019 (Dr. Marcus Gates), and the neurosurgeon who replaced Appellant at Cobb in 2022. (Dr. Saint-Aaron Morris). (JA-1606, Hunt ¶¶ 21-22.)

*Second*, to the extent it is relevant, all of the record evidence shows that Cobb's peer review process was applied to Appellant in an objective and nondiscriminatory manner as prescribed by clear and comprehensive Bylaws and a

Professional Practice Evaluation policy. *See supra* Statement of Undisputed Material Facts, 3.

## III.  APPELLANT DID NOT SHOW A TRIABLE INFERENCE OF DISCRIMINATION UNDER THE "CONVINCING MOSAIC" APPROACH

Lacking evidence of a comparator to make out a *prima facie* case or evidence of pretext, Appellant invokes the "convincing mosaic of circumstantial evidence" theory. (*See* AOB at 42, 46-49.) A "convincing mosaic" may include evidence of "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn [;] (2) systematically better treatment of similarly-situated employees [;] and (3) that the employer's justification is pretextual." *Lewis v. City of Union City,* 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (internal quotation marks and citation omitted) (discussed in *Poer,* 100 F.4th at 1337); *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310-11 (11th Cir. 2023) ("[A] 'convincing mosaic' is a metaphor, not a legal test and not a framework."). Thus, as articulated by this Court in *Lewis II* and other decisions, the second and third categories of evidence substantially overlap with the *McDonnell Douglas* approach.

This case has none of the categories of "mosaic evidence" identified in *Lewis II* (nor any other evidence) that, considered together, may be sufficient to raise a triable inference of intentional discrimination. Instead, Appellant points to irrelevant

"evidentiary tiles" that "cannot now be reassembled to create a convincing mosaic of discriminatory intent." *Flowers v. Troup Cnty., Ga.*, *Sch. Dist.,* 1 F. Supp. 3d 1363, 1381 (N.D. Ga. 2014), *aff'd*, 803 F.3d 1327 (11th Cir. 2015). Even allowing all *reasonable* inferences from the undisputed record evidence, there is no triable issue of intentional race discrimination.

A.    <u>There Is No Evidence of Ambiguous Statements or Suspicious Timing</u>.

There is no record evidence, or suggestion in Appellant's Brief, that Dr. Benedict or Dr. Muster made a racially offensive comment or even remarked about Appellant's race at any time, let alone in proximity to the termination decision. As for the timing of the decision to terminate Appellant's employment, there is nothing "suspicious" or arbitrary about it. Appellant started working full-time at Kennestone in approximately the third week of July 2019.  (JA-1304, Muster 212; JA-1104-06, P's Ex. 36.) For roughly two months, his Kennestone colleagues had worked with him and provided the mentoring, surgical plan review, on-call back-up, and surgery "buddy" duty that the Action Plan contemplated. *See supra* at Statement of Undisputed Material Facts, 10. The timing of Appellant's termination in October 2019 is entirely consistent with Dr. Muster's belief that Appellant's colleagues tried to make the Action Plan work, as they had agreed, but found instead that assisting him with surgeries, as well as performing their own, caused them additional strain and burden, which they relayed to their superiors. *Id.*

B.    There Is No Evidence of Systematic Favorable Treatment of Similarly Situated Non-African-American Employees.

As noted above, Appellant vaguely asserts throughout his Brief that he was treated less favorably than his "Caucasian colleagues" because he allegedly was (1) not provided sufficient orientation, training, and support (AOB at 30, 43, 47-49); (2) not provided with "back-up" at Cobb (AOB at 30, 43, 47-48); and (3) subjected to numerous LOIs. (AOB at 30, 36, 39, 46.)

None of these vague assertions of favorable treatment allegedly given to non-African-American physicians is supported by any reasonable reading of the record or allows an inference of intentional discrimination. As to (1), Appellant offers *no evidence* that the orientation, training, and support he received was different from that given to any similarly situated white physician.[21] As to (2), the record reflects that physicians were required only to take 7 calls per month, that Appellant signed himself up for over 20 call days per month (for which he received additional pay), and that, when Dr. Benedict learned about this, he advised Appellant to restrict his call days to avoid "burn-out" – which he did for one month, before ignoring the suggestion of his practice group leader. (JA-921-22, 940-41, 961, 1025, Benedict 57-60, 133-134, 215-216, Pl. Ex. 3].) During the days that Appellant was not on call at

---

[21]    Appellant's assertion that on March 22, 2019, Drs. Muster and Benedict admitted that they failed to provide orientation, training, and support (AOB at 15, 49) is based only on ¶ 47 of Appellant's declaration (JA-2167), which is not properly before the Court (*see supra* part I), is hearsay, and in any event contains no comparative evidence.

Cobb, coverage was provided by the Kennestone neurosurgeon on call, just as it had been provided before Appellant joined WMG. (JA-1281, Muster 118-19.)

Item (3) is nothing more than Appellant's attempt to steer this Court's attention toward Cobb Hospital's peer review process and away from Dr. Muster's termination decision based on the burden and strain Appellant's execution of the Action Plan was causing his Kennestone neurosurgery colleagues. This "tile" suffers from two fatal defects.

*First,* there simply is *no evidence in the record* about the number of LOIs that other neurosurgeons received, which committee reviewed any initiated peer review with respect to them, or the final determinations those committees made with respect to any such peer review.

*Second*, even if a claim of discriminatory application of Cobb's peer review to Appellant were an issue in this case – *and it is not* – after he signed and agreed to the Action Plan (JA-2115, ¶ 116), there is no evidence that Dr. Benedict or Dr. Muster influenced or directed Appellant's Kennestone colleagues' reaction to the additional responsibilities, burden, and stress that Appellant's presence at Kennestone under the Action Plan placed on them. The factual basis for Appellant's termination developed *after* he arrived at Kennestone, as reflected in Dr. Hsu's, Dr. Parry's, and Dr. Lin's concerns, all of which post-date Appellant's peer review experience at

Cobb. (*See* JA-1450-51, Hsu ¶¶ 5-9; JA-1455-57, Parry ¶¶ 8-13; JA-1465, Lin ¶¶ 8-11.)

      C.    <u>There Is No Triable Evidence of Pretext</u>.

The third "mosaic" inquiry is whether there is triable evidence that the employer's stated reason for the adverse employment action is pretextual. As this Court explained in *Poer,* 100 F.4th 1325, the evidence considered under the "convincing mosaic" approach overlaps substantially with the pretext analysis under the *McDonnell Douglas* approach. The *Poer* court discussed the employer's "several legitimate, non-discriminatory explanations for terminating [plaintiff]," including performance issues and interpersonal conflicts. *Id.* at 1339. Then, the court determined that the "[plaintiff] has not offered any evidence to rebut the [employer's] legitimate, non-discriminatory explanations for terminating her. In other words, *as part of her convincing mosaic argument, [plaintiff] has not shown any pretext*." *Id.* (emphasis added). The court further determined, "[i]nstead of rebutting these non-discriminatory reasons the [employer] gave for terminating her, [plaintiff] offers only conclusory assertions about [the decisionmaker's] motivations. Such generalizations are not enough to rebut the [employer's] proffered reasons, nor do they create an inference of pretext." *Id.*

Likewise, here, for all of the reasons discussed in part II.B above, there is no triable evidence of pretext under any analytical approach.[22]

## IV.  NONE OF APPELLANT'S LIST OF ALLEGED "SPECIFIC ERRORS" BY THE DISTRICT COURT REQUIRES REVERSAL

Finally, the purported list of "specific errors" cited in the final section of Appellant's Brief (AOB at 37-52) does not warrant reversal. Appellant fails to identify any page within the District Court's order granting summary judgment where the alleged errors can be found. Long stretches of this section (e.g., AOB at 46-52) provide no record cites whatsoever in support of the arguments asserted. Again, this Court should not be required to "hunt for truffles buried in briefs" and should disregard arguments without factual citations.

---

[22]    The evidence here is not at all like the evidence in *Lewis II* which included, among other things, substantial comparative evidence. In *Lewis II,* the court found a triable issue of disability-based discrimination after a nearly five-page discussion of the "mosaic" of evidence presented, which included: the defendant placing the plaintiff on administrative leave, denying her return to work, and then terminating her for being absent without leave without having provided her with notice of key policies, the violation of which contributed to her termination; "ample evidence" that the defendant's reason for termination was pretextual including (a) evidence that other individuals outside of plaintiff's protected class with physical limitations were treated "far more favorably," (b) inconsistency in the defendant's view of the nature and severity of the plaintiff's medical condition; and (c) evidence of disparaging comments about women made by the plaintiff's supervisor. 934 F.3d at 1185-89. *See also Jenkins v. Nell,* 26 F. 4th 1243, 1250–51 (11th Cir. 2022) (denying summary judgment under "mosaic" analysis where the plaintiff's showing included evidence that a comparator committed a work rule violation (like the plaintiff) but remained employed).

Even putting that aside, this Court can readily dispose of the "specific errors" section of Appellant's Brief, which largely rehashes arguments made elsewhere (and responded to above), because none of these claimed "errors" creates a genuine issue of material fact.

- The "First" and "Fourth" alleged errors (AOB at 38, 39) relate to Cobb's peer review process. For all of the reasons discussed above, Appellant's peer review experience is neither factually nor legally relevant to Dr. Muster's termination decision. The District Court did not err by including a discussion of background facts in its opinion.

- The "Second" and "Third" alleged errors (AOB at 38-39) again miss the essential point that the District Court acted within its discretion in declining to consider Appellant's improperly submitted declaration (and cite to a nonexistent page of the JA (2776)). They also miss the important points that Dr. Muster, and not Dr. Benedict, made the termination decision, and that Appellant's unsurprising opinion that he was subjected to discrimination is not enough to survive summary judgment.

- The "Fifth" alleged error (AOB at 39-40) is immaterial and unsupported by record cites. The District Court is not required to include immaterial facts in its analysis and decision.

- The "Sixth" alleged error (AOB at 40-41) simply rehearses Appellant's immaterial personal opinion that he was not further burdening the Kennestone colleagues and his irrelevant contention that none of them told him in advance of his termination about their concerns. This alleged error posits several hypothetical questions that Appellant could have asked the Kennestone neurosurgeons if he had chosen to depose them. It is Appellant's burden to *prove* pretext, not surmise about what the evidence *might* have shown if Appellant had attempted to develop such evidence.

- The first and second "Seventh" alleged errors (AOB at 41) are incomprehensible.

- The "Eighth" alleged error (AOB at 41-42) relates to a memorandum written by Dr. Benedict after Dr. Muster's termination decision, and does not support an inference of intentional race discrimination by Dr. Muster.

- On pages 43-44, 46 of Appellant's Brief, Appellant discusses the District Court's analysis of *Lewis I* and its conclusion that Appellant failed to present comparator evidence. (*See* JA-2444-45.) For the reasons discussed above – most pointedly, the absence of record evidence – the District Court did not err in concluding that Appellant's arguments about allegedly dissimilar treatment in matters such as initial mentorship and on-call support were not sufficient to

"strongly suggest" that Appellant's race was the "but for" reason for his termination.

Because none of these alleged "errors" create a genuine issue of material fact, none of them warrants reversal of the District Court's grant of summary judgment to Appellees, which should be affirmed.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellees respectfully request that this Court affirm the District Court's order granting summary judgment on and dismissing Appellant's claims.

Date:  October 17, 2024

Respectfully submitted,

SEYFARTH SHAW LLP

By  */s/ Daniel P. Hart*
      Daniel P. Hart

      1075 Peachtree Street, N.E., Suite 2500
      Atlanta, GA  30309-3958
      (404) 885-1500

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with Fed. R. App. P. 32(a)(7)(A) and 11th Cir. R. 32-4 because the word count of relevant sections, based on Microsoft Word's word-counting function, totals 12,435 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14.

*/s/ Daniel P. Hart*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2024, a copy of the foregoing **APPELLEES' BRIEF** was electronically filed with this Court via the electronic filing website. A copy of same was also served via U.S. mail with adequate postage thereon addressed as follows:

*/s/ Daniel P. Hart*
Daniel P. Hart
Counsel for Appellees