No. 24-12243

-----------------------------------------------------------------------------------------

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

DR. DARE ADEWUMI,

Plaintiff-Appellant,

v.

WELLSTAR MEDICAL GROUP and WELLSTAR HEALTH
SYSTEMS, INC.

Defendant-Appellee,

NORTHSIDE HOSPITAL, INC.

Defendant.

Appeal from the United States District Court for the Northern District of
Georgia
No. 21 cv 04048

---

## APPELLANT'S REPLY BRIEF

---

Michael H. Sussman, Esq.
1 Railroad Avenue
Goshen, New York
(845)-294-3991
Attorney for Dr. Dare Adewumi

## <u>APPELLANT'S CERTIFICATE OF INTERESTED PARTIES</u>

The undersigned counsel of record for appellant certifies that the following is a full and complete list of each trial judge, attorney, person, associations of persons, firms, partnerships or corporations who or which have an interest in the outcome of this appeal, including their subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporations that own 10% of more of any party's stock, and other identifiable legal entities related to any party:

Adewumi, Dr. Dare (Plaintiff-Appellant)

Fuller, Hon. J. Clay (Magistrate Judge, U.S. District Court for the Northern District of Georgia)

Hart, Daniel P. (Attorney for Defendants-Appellees)

Hill, William B., Jr. (Attorney for Defendants-Appellees)

Hoffler, Tricia (Attorney for Plaintiff-Appellant)

Koelker, Kelly J. (Attorney for Defendants-Appellees)

Pannell, Hon. Charles A., Jr. (Judge, U.S. District Court for the Northern District of Georgia)

Seyfarth Shaw LLP (Counsel for Defendants-Appellees)

Sussman, Michael H. (Attorney for Plaintiff Appellant)

Sussman & Goldman (Counsel for Plaintiff-Appellant)

The Hoffler Firm (Counsel for Plaintiff-Appellant)

Wellstar Medical Group, LLC (Appellee)

Wellstar Health Systems, Inc. (Appellee)

# <u>TABLE OF CONTENTS</u>

APPELLANT'S CERTIFICATE OF INTERESTED PARTIES

TABLE OF AUTHORITIES.................................................................. ii

PRELIMINARY STATEMENT ............................................................ 1

ARGUMENT .....................................................................................

    <u>Point I</u>

    The record supports vacation of summary judgment...................................... 8

        A. Appellant makes out a prima facie case ................................ 9

        B. A reasonable jury could find pretext ................................. 10

        C. A mosaic of circumstantial evidence does support
           Appellant's claim................................................................. 14

    <u>Point II</u>

    Appellant complied with Fed. R. Civ. P. 56 and Local Rules...................... 17

CONCLUSION ................................................................................. 19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Albert-Aluya v. Burlington Coat Factory Warehouse Corp.*,
    470 F.App'x 847 (11th Cir. 2012) ................................................................ 11

*Cheatwood v. City of Vestavia Hills*,
    2022 WL 2921304 (11th Cir. July 26, 2022)............................................. 10

*Davis v. Williams*,
    451 F.3d 759 (11th Cir.2006) ..................................................................... 19

*McQueen v. Alabama Dep't of Transp.*,
    769 F.App'x 816 (11th Cir. 2019) .............................................................. 12

*Reese v. Herbert*,
    527 F.3d 1253 (11th Cir. 2008) .................................................................. 18

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000)..................................................................................... 13

*Tynes v. Fla. Dep't of Juv. Just.*,
    88 F.4th 939 (11th Cir. 2023) ..................................................................... 10

## PRELIMINARY STATEMENT

This Reply Brief refutes the factual inaccuracies and fallacious legal propositions in Appellees' Brief. It does not repeat arguments fully set forth in Appellant's Brief in Chief.

1. Wellstar Medical Group [WMG] is not a separate entity from Wellstar Health System Inc. It is a component or part of [WHS]. JA-2710-11 ¶ 9.[1]

2. After he commenced employment, Dr. Adewumi commenced a six-month probationary period during which all his cases were reviewed. Dr. Muster explained that all physicians have an initial focused professional practice evaluation monitoring plan. During this period, Adewumi had no issues. JA-2712 ¶ 15. Appellees do not deny that Appellant passed this probationary period and none of his cases were flagged. JA-2709 ¶ 11.

3. Appellees ignore the evidence of disparate treatment to which Appellant attested: for example, while Dr. Benedict advised him that members of the WMG were to be on 24-hour call seven/days/month, he was the only neurosurgeon on call every day because Dr. Benedict assigned no other

---

[1] Citations are made to the Adewumi Declaration and many of the 72 exhibits marked at the depositions of Appellees' agents [JA-1445-1616], nearly all of which Appellees produced during discovery and which are cited to support Appellant's counterstatement of facts presented below. Many of those documents were attached to Appellees' moving papers below and are referenced in Appellant's Reply to Defendants' Statement of Undisputed Facts. Rather than "self-serving," Appellant's Declaration cites admissions made by Appellees' agents at their depositions and business records they created. These sections of the JA, that is pages after JA-2700, were timely filed with this Court, and Appellees' counsel received these documents below and on this appeal.

neurosurgeon to cover for him. JA-2711-12 ¶ 13, JA-2719-20 ¶ 36. Though Appellant continued to raise the disparate burden placed on him to Dr. Muster through late May 2019, it was never remedied and worsened during the spring 2019. JA-2728-2730 ¶¶ 55-57. While Dr. Benedict told him that other members of the neurosurgery group would actively support him at Cobb, this never happened, and Dr. Benedict did not invite him to Kennestone during his first year of employment for mentoring or collegial interaction. JA-2711 ¶ 10.

4. After Dr. Adewumi successfully completed his probation, Dr. Benedict started reviewing his cases and drafting numerous letters of inquiry directed to him. Appellant explained the process in detail to the district court. JA-2714 ¶¶ 19-22. Rather than provide constructive feedback to Appellant as the chief of his service, Benedict used his position to generate numerous letters of inquiry. While Benedict claimed that, after first reviewing Appellant's charts, he "immediately" contacted Adewumi to have a collegial meeting to discuss the cases, this is categorically false. JA-2715 ¶¶ 22, 25-26.

5. After Dr. Adewumi responded to each letter, the MEC met to review the letters and his responses. Dr. Benedict attended a late January 2019 MEC meeting, and another held on March 1, 2019. JA-2719 ¶ 32. Dr. Adewumi was not invited to do so. Dr. Benedict continued to play the pivotal role in assessing Appellant's cases after March 1, 2019. JA-2721 ¶ 37.

6. Dr. Adewumi accused Dr. Benedict of bias, and Appellees claim that this was not about racial bias. But both he and Dr. Muster plainly understood that this was exactly what Appellant referenced and explained that Benedict reacted passionately and was frustrated that we would be accused of "such a thing." JA-1752.

7. Appellees admit that Dr. Sayeed lacked the expertise to recommend sending a LOI to Appellant following his March 21, 2019 surgery, yet authored this document. Dr. Adewumi has explained precisely what happened after the craniotomy mortality – he met with an ad hoc committee whose members told him "this was a tough case," and he "received handshakes and smiles from several in attendance." JA-2731 ¶ 58.

8. Starting in March 2019, Dr. Benedict and Dr. Muster discussed placing Adewumi on an improvement plan and did so. This was months before the Cobb MEC placed him on an almost identical plan. JA-2722-25 ¶¶ 38-47.

9. Muster and Benedict both claim to have proposed that the Cobb MEC have an external review done of Appellant's cases. JA-2734 ¶ 64. This was done because Appellant had accused Benedict of harboring bias against him. *Id.* at ¶ 65.

10. Appellees concede that the external reviewer found no error in Appellant's medical practice but favored a "less aggressive" approach. Both Dr. Muster

and Dr. Benedict denied seeing the external report, JA-1750, JA-1295, and Dr. Muster testified that it played no role in Appellant's termination. Appellant's expert reviewed each of the cases sent for external review and concluded that Dr. Adewumi engaged in no deviation from any standard of care in any of the cases.

11. In June 2019, Muster proposed that Appellant resign or face imposition of an action plan, which he would have to complete to avoid being reported to the National Data Bank. JA-2733 ¶ 63. At the meeting, Muster told Appellant that he would likely be placed on an action plan within a week. *Id.*

12. In early July 2019, Dr. Benedict convened a meeting of WMG neurosurgeons to review the proposed Cobb MEC improvement plan weeks before anyone presented it to Appellant. Appellees distance Dr. Muster and Dr. Benedict from development of the plan. However, Dr. Benedict's July 3, 2019 memorandum demonstrates his knowledge of its elements and the Kennestone neurosurgery group, Dr. Benedict and Dr. Muster altered the plan on July 9, 2019, a week before anyone presented it to appellant. JA-1756-57.

13. Appellant disputes that during the improvement plan Dr. Benedict "did not work directly with him." In fact, Adewumi contravened this claim at length in his Declaration: "...between late July and late September, I saw Benedict daily and he remarked that he would "make [me] a resident again" . . .

Benedict made me perform duties at Kennestone which resembled those performed by an intern and sought to humiliate me." JA-2740-41 ¶ 80. Benedict never provided any constructive feedback or criticism after the action plan was implemented. JA-2741-42 ¶¶ 83-85.

14. Dr. Benedict prepared a written report to Dr. Hughes of Appellant's implementation of the action plan on October 8, 2019. He wrote, "the mentoring process involves daily supervised calls with the Kennestone partner from 7 a.m. to 3 p.m. Monday to Friday. In addition, he took four overnight calls, generally one being on the weekend. All surgery was with a Kennestone partner, all cases with staff. Dr. Adewumi rounded every day that he worked. He was off call the day after an overnight shift. He would schedule his Cobb clinics on those days. Dr. Adewumi fulfilled the plan as outlined above. He responded to calls. He interacted with the medical staff appropriately." JA-1831, 1834. Contemporaneous with the termination decision, Dr. Muster wrote that Appellant was "fully complying" with the Cobb MEC action plan. JA-1832.

15. Dr. Benedict claims he recommended Appellant's termination and sent several emails conveying this. JA-1287. Appellees never produced any such email. JA-2742-43. Dr. Muster swore that Dr. Benedict never proposed terminating Appellant. JA-1755. Though the head of the neurosurgery group,

5

which Muster claims was overburdened by the action plan they agreed to three months earlier, Benedict could not recall meeting with his partners concerning Appellant or discussing his termination with them. JA-1289-1290. None of the members of the group told Benedict that they wanted Adewumi terminated. JA-1290. Likewise, Muster admitted he met with no members of the WMG concerning implementation of the action plan. JA-1761.

In summary, a reasonable jury could conclude the following facts of particular pertinence to this appeal: Appellant was isolated at Cobb Hospital, and members of the same medical group provided him with no support or back-up. This contradicted the representations made by Dr. Benedict, who explained to Appellant the terms and conditions of his employment. The lack of back-up caused Dr. Adewumi to work far in excess of any of the other physicians in the group, as explained by Dr. Benedict – 7 on call shifts per month. When Dr. Adewumi sought assistance, none was forthcoming.

Like other physicians, Dr. Adewumi was subject to an initial monitoring period, which he passed without issue or incident. In November 2018, Dr. Benedict began reviewing his cases and writing letters of inquiry. Contrary to his claims, Dr. Benedict did not "immediately" meet collegially with Appellant and discuss any shortcomings.

6

Between November and March, Dr. Benedict repeatedly raised issue with Dr. Adewumi's medical practice. Those he was raising issue with lacked the expertise to evaluate his criticism. Dr. Adewumi defended his practices in responses to letters of inquiry but only Dr. Benedict met with the Cobb MEC.

By March 2019, Dr. Adewumi believed that Dr. Benedict harbored racial bias toward him. He explained this to Dr. Muster, who immediately shared this with Dr. Benedict, who became irate. Dr. Muster did not refer Appellant to the appropriate EEO officer and sought to develop an informal action plan to address Dr. Benedict's issues with Dr. Adewumi's practice. Dr. Benedict remained deeply involved in analyzing Appellant's cases. In late May, Dr. Benedict wrote Dr. Muster suggesting that Dr. Adewumi be terminated. Dr. Muster met with Dr. Adewumi on June 11, 2019, and suggested that he resign or face an action plan from the Cobb MEC. Dr. Adewumi declined and noted the ongoing bias to which Dr. Benedict was subjecting him,

None of the cases that Dr. Benedict flagged demonstrated any deviation from medical practice and no expert has so claimed. At Benedict and Muster's urging, the Cobb MEC hired an expert to review the cases, which the MEC felt demonstrated inappropriate care, but the expert did not confirm that and noted that each was handled within the standard of care. Dr. Adewumi's expert reached the same conclusion, if even more favorable to Appellant.

In early July 2019, Muster and Benedict reshaped the MEC action plan, causing Dr. Adewumi to be placed at Kennestone full-time. Dr. Adewumi signed the action plan and assiduously complied with its terms. Between July and early October, he met twice with representatives of the Cobb MEC and received praise for its implementation. No one from his medical group expressed any issues with his medical practice or otherwise. No one suggested implementation of the plan was burdening him.

Meanwhile, Dr. Benedict continued his hostile conduct, assigning Appellant tasks well beneath his skill level and telling him he would treat him like a resident. Benedict claims he recommended plaintiff's termination. Muster denies this and submits that he concluded that implementing the action plan overburdened the other neurosurgeons. Muster admits to having no meetings with the group members after implementation of the plan, and there is no contemporaneous writing which confirms that anyone raised any such issue with Muster before he terminated appellant.

## ARGUMENT

### Point I

### The record supports vacation of summary judgment.

Summary judgment was improvidently granted in this case because the reviewing Court failed to review the record in the light most favorably to Appellant and failed to draw reasonable inferences which a reasonable jury could.

## A. Appellant makes out a *prima facie* case.

First, Appellant made out a *prima facie* case of racial discrimination. He is black, qualified for the position, and was terminated after being subject to disparate treatment during the course of his employment. Specifically, he was isolated, overworked and denied the support Benedict promised. He was issued numerous baseless letters of inquiry and, on the evidence taken most favorably to him, did not deviate from medical standards, yet was subjected to an improper action plan. No white doctor faced the same obstacles and issues, and a reasonable jury could agree that Appellant was treated in a manner disparate from any of them.

In denying that Appellant made out a *prima facie* case, Appellees revert to disputed issues of fact, claiming that he has not shown that any white doctor was "causing strain and imposing additional burdens on his colleagues." However, this argument presupposes that a reasonable jury would have to accept that implementation of the action had this effect; in fact, there is no reason to believe that this ever occurred. No such burden was ever discussed or mentioned to Appellant and there is no contemporaneous record or evidence suggesting this.

Nor does rejecting this sophistry mean that Appellant relies on "bare allegations" of race bias; instead, he points to the pattern of conduct to which he was subjected, precisely the kind of mosaic of evidence which this Court found may

9

satisfy a plaintiff's burden in the controlling precedent. *See Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939 (11th Cir. 2023).

## B. A reasonable jury could find pretext.

A reasonable jury could review the record and find no contemporaneous support for the conclusion that Appellant was over-burdening the neurosurgery group. A reasonable jury could conclude that despite all the smoke, there was no reason to fire Adewumi.

First, while focusing on his disputed practice deficiencies, Appellees do not even attempt to defend their adverse action on this basis. After expending many pages describing the peer review process and Adewumi's disputed practice issues, the case comes down to a different issue: whether a reasonable jury could reject as pretextual the concocted argument that, after ten weeks of its uneventful implementation, the action plan overburdened professional colleagues who, just three months earlier, had agreed to cooperate with it. The decision-maker, Muster, admits he did not meet or speak with a single member of the group after implementation of the action plan. There is no contemporaneous writing, whether text, email, or review, supporting the "overburden" argument or complaining about the appellant. There was hardly "abundant and uncontroverted independent evidence that no discrimination had occurred." *Cf. Cheatwood v. City of Vestavia Hills*, No. 21-13680, 2022 WL 2921304, at *1 (11th Cir. July 26, 2022).

10

Instead, a reasonable jury could conclude that the reason adduced for the adverse action was highly pretextual, masking bias, and unworthy of belief and supported only by interested parties who could point to no real-time evidence of their concern. *Albert-Aluya v. Burlington Coat Factory Warehouse Corp.*, 470 F.App'x 847, 851 (11th Cir. 2012). It could conclude that the alleged reason was weak and the absence of contemporaneous evidence makes it implausible. *Id.*

Appellees submit that Dr. Adewumi's denial that he burdened the practice is analogous to an employee denying he was tardy when time track records showed the opposite. But this is a plainly flawed analogy, which only makes the point: here, there is no contemporaneous evidence of any "over-burden," and the decision-maker points to no evidence outside of his head which supports this drastic decision.

Indeed, the only documentation, written by Benedict, makes no mention of any such overburden and notes that Appellant was interacting well with other staff members. Had such overburden been an issue, a jury would reasonably expect that Benedict would have reported this to the Cobb MEC. He did not and this, too, raises suspicion as to the pretextual nature of this allegedly legitimate reason for the adverse action.

A reasonable jury could also view the process leading to the termination with suspicion: first, Benedict claims to have recommended termination. Muster denies this occurred and claims the two never discussed Appellant's termination. A jury

11

can reasonably view Muster's denial as a way to distance his decision from Benedict. But Muster testified that he generally relies on practice leaders like Benedict in making hiring and firing decisions, and a reasonable jury could view Benedict as at least highly influential in this decision.

The same jury could then consider the totality of Benedict's actions toward Appellant as supporting the conclusion that he deprived Appellant of the same rights as he provided Caucasian doctors: he isolated Adewumi; he deprived Adewumi of back up and support; he did not provide Adewumi the kind of collegial support he said he did provide; he concocted many letters of inquiry, which painted Adewumi in an undeserved negative light and set the table for all that followed; he learned that Adewumi viewed him as biased, claimed then to have absented himself from reviewing Appellant's medical cases but did no such thing; he proposed terminating Adewumi in May 2019 and then belittled and demeaned him during implementation of the action plan.

To this, Appellees respond only with a conclusory statement that Appellant "has no such evidence" from which a mosaic of circumstantial proof could prevail [Appellees' Brief at 37] and cite inapposite authority, *i.e.*, *McQueen v. Alabama Dep't of Transp.*, 769 F.App'x 816, 822 (11th Cir. 2019) (holding that in an unequal pay claim, plaintiff must compare himself with similarly situated and qualified employees).

12

In adjudicating a summary judgment motion, the Court should review the record as a whole and, in doing so, "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). As such, "the court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.*

Applying this basic Supreme Court precedent, the district court should have held that it cannot grant summary judgment based on testimony that a reasonable jury could reject and found a material issue of disputed fact as to whether this asserted reason was pretextual, concocted to mask discriminatory intent.

Appellees next address the cat's paw theory and claim there is no way a reasonable jury could find that Dr. Benedict engaged in intentional racial bias. But, again, this ignores the evidence discussed above taken most favorably to the Appellant. The record includes broken promises of support, false statements Benedict made, including his claims that as soon as he found error issues, he "immediately" discussed these with Adewumi and that after being advised of Appellant's concern that he was biased, he stepped back from dealing with Adewumi when, in fact, he continued to draft letters of inquiry and then recommended plaintiff's termination. The assertion that there is NO evidence supporting the

conclusion that Benedict treated Adewumi differently in all these regards is fatuous and distorts the record taken most favorably to Appellant.

Appellees advance other arguments which are indecisive and do not warrant summary judgment as a matter of law. That Dr. Muster approved of the hiring of Dr. Adewumi several years before he was terminated does not mean that he did not engage in racial discrimination. That Appellees hired other African Americans does not mean it treated Dr. Adewumi in a non-discriminatory manner. While these matters may support a permissible inference that discrimination was not afoot, they do not dictate that result, and no case Appellees cite is to the contrary.

**C. A mosaic of circumstantial evidence does support Appellant's claim.**

Appellees have consistently ignored the record evidence, which disfavors their narrative, and continue to do so in this section of their brief.

Dr. Paul King is an African American neurosurgeon with extensive history with Muster and Benedict. His Declaration in opposition to Appellees' motion for summary judgment relates that he was subject to the same treatment as Appellant by Dr. Benedict: "once Wellstar took control over AMC, due to a serious family illness, my partner and I had the need for coverage in neurosurgery at AMC and I sought it from Dr. Benedict. He would not provide such coverage. I also sought to be privileged at Kennestone and, despite my lengthy and successful career, was denied." Dr. King also reviewed appellant's medical charts and concluded that "the

cases present no deviations from the standard of care in this community but reflect double standards applied to him and other African Americans who have worked with this group," including himself. JA-2847-48.

Dr. Marcus Ware, a board-certified neurosurgeon, reviewed the charts of five cases sent out for external review and concluded that in each, Appellant met the standard of care. JA 2836-45, 2749 ¶ 104.

One of the physicians in the neurosurgery group, Dr. Humphreys, then the only other African American, stated that Appellant's termination was a "hit job" and an "assassination" and denied being consulted in any way about it. JA-2744 ¶ 90. Other members of the group denied any consultation concerning this decision and the declarations submitted by several members of the group reference no meetings or conversations concerning the subject. *Id.*

On April 1, 2019, Adewumi met with Muster and reported that he felt Benedict harbored a bias against him and "seemed to distrust [my] ability to practice medicine based upon my race and background." JA-2726 ¶ 48. Muster admitted that, after Appellant complained about bias to him, he did not report this to Jeffrey Hines, then responsive for diversity issues for Wellstar. *Id.*

Dr. Adewumi declared under pains and penalties of perjury that [i] Dr. Benedict advised that other members of the neurosurgery group actively support him but that this never materialized [JA-2711 ¶ 10]; [ii] he was always on call, contrary

to the seven/call/month standard Dr. Benedict testified applied to other members of the group [JA-2711-12 ¶ 13]; [iii] because he received no support/coverage, he was expected to respond in a way different than any of his white colleagues who covered for each other and received criticism for not meeting this impossible expectation [*Id.*]; [iv] Benedict provided Appellant with no practice-related guidance though he knew Adewumi was working on a huge number of cases and way over the hours of others; [JA-2713 ¶ 17]; [v] contrary to his false claim, Benedict did not raise any practice issues with Adewumi after first reviewing his charts, [JA-2715 ¶ 22], an action anyone would expect him to have taken were he concerned either about the quality of care appellant provided or assisting appellant improve; [vi] when the two men finally met in January 2019, Dr. Benedict pretended the letters of inquiry which he wrote had been written by someone else and excoriated appellant for them and rebuked appellant's request for additional support; [JA-2716 ¶. 25]; [vii] on March 22, 2019, in a meeting, Muster and Benedict admitted they failed to provide him mentoring; JA-2725, para. 47; [viii] after Muster, Benedict and Appellant agreed to implement an informal plan to provide greater supervisor, Benedict "did not make himself available for the weekly conferences" with Appellant [JA-2728 ¶ 55]; [ix] on May 24, 2019, Appellant met with Muster and explained that he remained highly overburdened, on call at Cobb every single day and then the sole provider responsible for overnight coverage. When Dr. Muster responded that he should sign

out and allow staff to call Kennestone for back-up, Adewumi explained that no such coverage system was in place and that when he tried to enlist Benedict's support, "he had expressed anger at my request for support"; [x] on May 29, 2019, Benedict proposed that appellant leave the practice [JA-2731 ¶ 60]; and [xi] on June 11, 2019, Muster proposed that appellant resign or face an action plan, claiming that this would be imposed because Adewumi was not as committed or present as others want. [JA-2733].

Appellees claim that the "mosaic" here differs from that considered in other cases. Regardless, Appellant was treated in an inferior manner, knowingly isolated, overworked and not provided coverage. He was falsely accused of substandard medical practice and, because of these false accusations, subjected to an action plan. And, though appellant discharged that plan well, Muster then used it as a basis for terminating him. A reasonable jury could find that no white neurosurgeon was subject to such treatment or subject to the humiliation of an action plan, let alone termination which occurred during its successful completion on the ground that those who forced it upon appellant now found it too burdensome to others

### Point II

### Appellant complied with Fed. R. Civ. P. 56 and Local Rules.

Rule 56 requires a party opposing summary judgment to present to the district court Declarations and exhibits which establish the elements of his case. Appellant

has done this here and referred, as is of course permissible, to evidence supplied by Appellees in support of their motion. Here, Appellees' moving papers provided both the deposition transcripts of Muster and Benedict, as well as the approximately seventy exhibits Appellant's counsel marked at depositions of Appellees' agents. Appellant's Rule 56.1 response properly cited these sources in opposing the motion.

Appellees' counsel understand that plaintiff controverted their Rule 56 Statement through a detailed response. JA-2640-2687. Appellant also submitted an extensive declaration which attached exhibits supporting his claims. JA-2709-2845. Appellees desperately want this Court to ignore this record evidence and decide the case on their entirely disputed version of events. Citing *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008), Appellees suggest that Appellant failed to comply with local rule 56.1, though Appellant filed an extensive response to each of the contested facts set forth in appellees' Rule 56.1 statement. JA-2640-2687.

All of this evidence was squarely placed before the district court in admissible form, and both the Magistrate Judge and the district court made references to the same in resolving the motions before them. In fact, the district court decision does consider the evidence it otherwise claims not to have considered. Contrary to Appellees' claim, the actual holding in *Reese* applies equally here: "In sum, the district court erred by failing to review the full record on summary judgment and by failing to construe the facts and make all reasonable inferences and credibility

choices in favor of the non-moving party. That is, "[e]ven though the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case, our analysis for purposes of summary judgment must begin with a description of the facts in the light most favorable to the plaintiff." *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir.2006) (internal quotation marks and citations omitted). We proceed to that analysis. Indeed, as in *Reese*, here the district court selectively referred to materials it claims were outside the summary judgment record when, in fact, those papers were properly before the court and should have been considered in full.

## CONCLUSION

Since a reasonable jury could return a verdict for appellant on this record, summary judgment was improvidently granted, and that order should be vacated and the matter tried to a petit jury.

Dated:     Goshen, New York
           November 7, 2024

                               Respectfully submitted,

                               SUSSMAN & GOLDMAN
                               *Attorneys for Plaintiff-Appellant*

                               By:   /s/ Michae. H. Sussman
                                     Michael H. Sussman, Esq.
                                     1 Railroad Avenue, Ste. 3
                                     P.O. Box 1005
                                     Goshen, New York 10924
                                     (845) 294-3991 [Tel.]
                                     (845) 294-1623 [Fax]
                                     sussman1@sussman.law

19

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Michael H. Sussman, Esq., counsel for appellant, hereby certifies that the annexed reply brief has been prepared on a desk top computer using 14-point Times Roman font and contains 4,370 words and thereby complies with F.R.A.P. 32.

Dated:  November 7, 2024

_____
MICHAEL H. SUSSMAN, ESQ.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically served through CM/ECF and via U.S. mail, postage pre-paid, appellant's Reply Brief upon the parties to this matter through their counsel as follows:

Daniel P. Hart, Esq.
Seyfarth Shaw LLP
1075 Peachtree Street, N.E. Ste. 2500
Atlanta, Ga. 30309
Counsel for Wellstar defendants

This 7th day of November 2024.

_____
MICHAEL H. SUSSMAN, ESQ.